**ALLIED PAINT MANUFACTURING COMPANY, INC.**

v.

**The UNITED STATES.**

No. 210–70.

United States Court of Claims.

Dec. 12, 1972.

Theodore M. Kostos, Philadelphia, Pa., attorney of record, for plaintiff; Samuel H. Sagett and Stassen, Kostos & Mason, Philadelphia, Pa., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Kenneth R. Harkins with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on February 24, 1972, wherein such facts as are necessary to the opinion are set forth. Plaintiff filed a request for review by the court of the commissioner's opinion and report, defendant urged the court to uphold the report and the case has been submitted to the court on the briefs of the parties and oral argument of counsel.

Since the court is told that this is a "test" case, and that a large number of comparable cases are pending at the administrative level awaiting the present decision, we are at pains to point out that, aside from the general legal issue of the defendant's right to change the inspection procedure, our disposition is grounded in the particular factual determinations of the Board of Contract Appeals on the basis of the particular proof in this specific record, and that those factual determinations cannot serve as a precedent for other cases in which the relevant proof differs significantly. It is possible, therefore, that the decision may turn out to be less of an overall guidepost than the parties anticipated.

Since the court agrees with the commissioner's opinion and report, with some modifications by the court in the opinion and the recommended conclusion, it hereby adopts the same, as modified, together with the foregoing paragraph, as the basis for its judgment in this case.*

Therefore, plaintiff's motion for summary judgment is denied and it is not entitled to recover. Conversely, defendant's cross-motion for summary judgment is granted with respect to plaintiff's claim. Dismissal of the petition will be withheld until determination of defendant's counterclaim, and proceedings in this court on the counterclaim are suspended until the completion of the administrative proceedings on the matter of excess reprocurement costs.

Commissioner Harkins' opinion, as modified by the court, is as follows:

This contract case is before the court on cross-motions for summary judgment under Rule 163(b). Plaintiff seeks review pursuant to the standards of Sections 1 and 2 of the Wunderlich Act,[1] of a decision by the General Services Board of Contract Appeals,[2] which upheld the default termination of 31 purchase orders issued under Contract No. GS–OOS–51321. This contract was an indefinite quantity term contract of the General Services Administration for the manufacture and delivery of FSC Group 8010-paint to satisfy the normal supply requirements of GSA storage depots. Plaintiff seeks to have the termination for default converted to termination for convenience, and for such further relief

---

* The concurring opinion of Nichols, Judge, follows the opinion of the trial commissioner which has been adopted by the court.

1. 68 Stat. 81, 41 U.S.C. §§ 321–22 (1970).

2. Allied Paint Mfg. Co., GSBCA No. 1488; 67–1 BCA ¶6387.

as may be just and equitable. Defendant counterclaims the sum of $9,820.07 for excess costs resulting from re-procurement of the items terminated for default.[3]

The question presented is whether the administrative record supports the determination by the General Services Board of Contract Appeals that plaintiff's failure to undertake production or to offer for delivery the items to be procured under the terminated purchase orders justified a default termination notwithstanding the fact that acts by the General Services Administration in the administration of other contracts admittedly adversely affected plaintiff's ability to perform under all contracts. Additionally, there is a question of whether plaintiff's failure to deliver should be excused because the Government waived the delivery requirements, and a question of whether the default was excused by reason of unavailability of necessary raw materials.

■■■ It is my opinion that the board's decision is supported by substantial evidence and plaintiff's motion for summary judgment is defeated.

Plaintiff, Allied Paint Manufacturing Company, Inc., of Lansdale, Pennsylvania, has been a paint manufacturer since 1943. In 1956, Allied Paint became a supplier to the Department of Defense and since that time has developed a specialty business in Government specification paints. By 1963, Allied Paint was supplying over 1 million gallons of paint a year to the Department of Defense. This amounted to approximately $2 million in a total DOD paint procurement of $35 million. By 1963 virtually all of Allied Paint's business was with the Government, 95 percent with the Defense Department and 5 percent with various housing authorities.

In August 1963, procurement responsibility for the types of paint in FSC Group 8010 was transferred from the DOD to the GSA. At that time plaintiff's outstanding contracts with DOD were transferred to GSA with plaintiff's consent. Plaintiff completed the transferred contracts and subsequently obtained additional contracts from GSA. From August 1963 to November 10, 1964, plaintiff shipped over 1 million gallons of specification paint to GSA. In the 3-month period ending November 6, 1964, plaintiff shipped and billed to GSA approximately 450,000 gallons of paint.

The purchase orders that are the subject of this case were issued under Contract No. GS–OOS–51321, which was awarded to plaintiff on July 7, 1964, on an Invitation For Bids issued April 29, 1964. When plaintiff received this award, it had been awarded and was working on a number of similar requirements type contracts. On February 10, 1965, 32 purchase orders under Contract No. GS–OOS–51321 were terminated for default.[4] The terminated purchase orders, which had been placed between August 1, 1964, and November 13, 1964, involved 5,229 pails (approximately 26,145 gallons) of paint. There was 23 additional purchase orders under the contract that were placed between October 13, 1964, and February 28, 1965, which were filled and shipped in the period June 30, 1965, to September 29, 1965. These completed purchase orders involved 5,056 pails (approximately 25,280 gallons) of paint.

Contract No. GS–OOS–51321 was an "Indefinite Quantity Term Contract (With Guaranteed Minimum)," for the period August 1, 1964, through February 28, 1965. Paragraph 1, *Scope of Contract,* recited that the contract pro-

3. By stipulation, the claim for excess costs was not considered by the board. Stipulation No. 7 before the board, dated October 22, 1965, states:

"No excess costs incurred by the Government in its reprocurement of items of paint due from the contractor under terminated orders have been assessed against the Contractor's account and are not intended in this appeal as an issue in dispute."

4. The board subsequently found that one purchase order had been terminated prematurely.

vides for the "normal supply require-ments of the General Services Adminis-tration Stores Depots" during the con-tract period. GSA was obligated

* * * except in emergencies to or-der hereunder such quantities as may be needed from time to time to fill any General Services Administration Stores Depots requirements deter-mined in accordance with the current-ly applicable procurement and supply procedures * * *. * * *

Estimated requirements of the various stores depots for the contract period were listed. The contract specified, however, that the estimates were for in-formation only and that the contractor was obligated to fill all orders that may be placed.[5] General Services Adminis-tration guaranteed to order a minimum of 50 percent of the estimated quantities shown for each destination.

The contract in paragraph 8 specified that supplies were to be ready for inspection 75 calendar days after receipt of a purchase order, and to be available for shipping 15 calendar days after no-tice of approval and release by the Gov-ernment inspector.

The contract incorporated Standard Form 32, General Provisions (Supply Contract) (Sept. 1961 ed.), and GSA Form 1424a (Mar. 1964 ed.), Addendum to General Provisions and Supplemental Provisions (Supply Contract). Section 3 of GSA Form 1424a substitutes a new Article 11(e) in the standard Default clause (Article 11, Standard Form 32). As modified by GSA Form 1424a, the standard Default clause provides that the contract shall be equitably adjusted to compensate for such termination if after notice of termination it is deter-mined that the contractor was not in de-fault and if, as in this contract, there was no termination for convenience pro-vision.

Clause 2, GSA Form 1424a, supple-ments the standard Inspection clause, Standard Form 32, Article 5(e). As supplemented, Article 5(e) provides that in no event shall there be a waiver of the Government's right to inspect and test completely any and all articles.[6]

The contract schedule, in paragraph 16, further adds to paragraph 5(e) of the standard Inspection article to deline-ate the supplier's responsibility in proce-

5. Paragraph 1 in part states:
"* * * Except as otherwise herein provided, the Contractor is obligated to deliver hereunder all such quantities as may be so ordered from time to time. The estimated quantities shown are for information of bidders only and shall not relieve the Contractor of his obliga-tion to fill all orders which may be placed hereunder. Unless otherwise di-rected by the Contracting Officer, Con-tractors shall fill delivery orders in the same order in which they are received. The urgency of particular orders may justify the Contracting Officer directing the filling of such orders on a priority basis."

6. Paragraph 2, Inspection, GSA Form 1424a provides:
"Article 5(e) of Standard Form 32, General Provisions (Supply Contract) Sept. 1961 edition is supplemented by the following:
"*Contractor Inspection Responsibility.* The inspection system required to be maintained by the Contractor under

paragraph (e) of Article 5 of the Gen-eral Provisions may be the Contractor's own facilities or any other inspection facilities or services acceptable to the Government. It shall be utilized to per-form all inspection and tests of materials and components prior to incorporation into end articles and for such end ar-ticles prior to offering the end articles for delivery under the contract. The right is reserved to the Government to evaluate the acceptability and effec-tiveness of the Contractor's inspection system prior to award and periodically during the contract period. Results of such evaluation may be used to deter-mine the extent of Government inspec-tion and test, but in no event shall the Government's right to inspect and test completely any and all lots offered for delivery under the contract be waived.
"Failure of the Contractor to main-tain an acceptable inspection system as provided in Article 5(e) and in this clause may result in termination of the contract under Article 11 of the General Provisions."

dures for quality assurance. Subparagraphs A through H of paragraph 16 establish detailed procedures and standards for acceptance testing. Subparagraphs A and H are as follows:

16. Supplier Responsibility—Quality Assurance Provisions: The requirements for supplier inspection responsibility as specified under "Inspection" paragraph (e), Article 5, of Standard Form 32 and GSA Form 1424a are as indicated below:

A. Complete Testing—Quantities 250 Gallons or Over

The supplier shall perform all acceptance test [*sic*] as required by the applicable specification(s) and submit laboratory test report on:

(1) The first lot or batch supplied on each contract providing for 250 gallons or more of the same material;

(2) The first lot or batch thereafter for each 5,000 gallons on the same contract.

\* \* \* \* \* \*

H. Government Verification Testing

If, at any time, Government verification testing indicates significant differences when checked against suppliers test reports, the supplier shall be advised and his quality control system shall be considered to be in non-comparable status. He will then be immediately required to submit laboratory tests on a complete testing basis on each batch until comparability is established. This action shall be effective regardless of the material then being manufactured or the contract under which it is being procured.

The 31 purchase orders that are the subject of this case were terminated for default on February 10, 1965. Except for efforts to procure raw materials, plaintiff did not undertake to produce the paint called for in these purchase orders. Consequently, plaintiff was never in a position to tender any paint for inspection within 75 days after receipt of the purchase orders, or to make any deliveries thereunder.

Plaintiff contends in this case, as it did unsuccessfully before the board, that the default terminations were invalid because its failure to produce for the purchase orders was caused by changes in GSA's method of administering its contracts with the paint industry, including its contracts with plaintiff.[7] These changed procedures involved: (1) in November 1964, GSA imposed an acceptance testing procedure on all paint offered for delivery that differed from the procedure that historically had been followed by GSA and by its predecessor, the DOD; (2) in July, August, and September 1964, GSA through inept, uncoordinated contract administration ordered paint, under plaintiff's other contracts as well as the subject contract, vastly in excess of the contract estimates and of plaintiff's known production capacity; and (3) in July and August 1964, under other contracts, GSA issued a large number of priority orders that dictated and interfered with plaintiff's production schedule. The effect of each of these changes on plaintiff was aggravated by their combination. The changes disrupted plaintiff's operations and prevented production for the terminated purchase orders. Plaintiff also contends that the default termination was improper because the Government elected to waive the delivery requirements while discussing for an extended period possible cancellation of the purchase orders, and because plaintiff's production was prevented by the unforeseen shortages of supplies of certain necessary chemicals, some of which were unavailable because of a strike.

7. The standard Default article exempts from liability for excess costs where the failure to perform arises out of " \* \* \* acts of the Government in either its sovereign or contractual capacity" beyond the control and without the fault or negligence of the contractor. Standard Form 32, Article 11(c).

*Change in GSA's Inspection Procedures.* When responsibility for procurement of certain types of paint was transferred to GSA in August 1963, the National Paint, Varnish and Lacquer Association sponsored a Government-Paint Industry Conference. At this conference, GSA's representatives explained GSA's procurement policies and procedures, and Allied Paint's representatives who attended the conference believed that DOD's inspection procedures would be employed by GSA. In fact, the paint acceptance testing procedures used by DOD were followed by GSA until November 1964.

Under the DOD procedures, a paint manufacturer would test in its own laboratory samples of the particular type of paint proposed to be supplied under a particular purchase order. Plant production would be authorized when the manufacturer's laboratory personnel were satisfied with the sample. The Government inspector would be notified and would visit the plant after the paint was ready for shipment, at which time he would verify availability for shipment, accept copies of the paint manufacturer's laboratory reports, and take samples for verification testing by the Government.[8]

In November 1964, GSA changed its paint acceptance testing procedures.[9] In the new procedure, no shipments were permitted until after GSA had performed tests on each lot in its own laboratories.

GSA's decision to change the acceptance test procedure was based on general industry experience and was not attributable to plaintiff's particular performance. No reason for the change in acceptance tests of paint supplied by plaintiff was communicated to plaintiff by GSA. The board noted that a GSA quality assurance specialist, and other GSA witnesses, had testified that quality considerations were not the basis for termination of plaintiff's purchase orders, and that there was a " * * * 'general tightening of our inspection across the board because we were getting indications from the field of difficulty with paint.' "[10]

The changed acceptance procedures had an impact on the plaintiff's business. The former DOD–GSA procedure permitted shipments to take place within 24 to 48 hours after the paint was manufactured. After the change, 4 months could elapse before a shipment could be made.[11]

When GSA instituted without notice its switchover to complete acceptance testing prior to shipment, it was not prepared to implement its new inspection procedure in a timely fashion. Ultimately, a total of 10 different GSA laboratories, plus a number of commercial laboratories, had to be brought into the program to accelerate completion of the new acceptance testing program.[12]

Delays in shipment resulted in a saturation of plaintiff's warehouse capacity. Prior to November 1964, plaintiff's normal stock of paint on hand ranged from 10,000 to 15,000 gallons at any one time. Under the changed procedure, by December 1964, nearly 150,000 gallons of paint were stored on plaintiff's premises. Municipal fire officials objected to the fire hazard presented by the large quantity of accumulated inventory on plaintiff's premises.[13]

8. 67–1 BCA at 29,586.

9. 67–1 BCA at 29,588.

10. 67–1 BCA at 29,590. Plaintiff's record with both DOD and GSA, insofar as quality is concerned, is good. During the period August 1963 to November 1964, GSA's verification testing on 84 samples of plaintiff's paint, representing about 800,000 gallons of paint, found one sample unsatisfactory. (67–1 BCA at 29,586.) After the change in November 1964, GSA tested 492 batches of plaintiff's paint. Although a total of 43 batches initially were rejected, on retesting only 15 remained unsatisfactory. This amounts to a rejection rate of 3 percent.

11. 67–1 BCA at 29,589.

12. 67–1 BCA at 29,589.

13. 67–1 BCA at 29,586.

The board found that the change in GSA's inspection procedures had a direct effect on appellant's total performance of all contracts. The board stated:

> * * * All testimony was in accord that the change to total GSA laboratory testing prior to release for shipment required a considerably longer period of time than the predecessor testing procedure. This change, therefore, had a direct effect on Appellant's total performance under all contracts, including curtailment of manufacturing plus inventory pile-up, with its attendant warehousing problems. The Board assumes that GSA found itself in a position as respects testing in its own laboratories which was novel as respects volume of work and which obviously it was not prepared to handle expeditiously at the time it inaugurated the program.[14]

Plaintiff contends that inventory buildup curtailed its ability to produce. Plaintiff was producing approximately 140,000 gallons a month in August and September 1964, but by December 1964 and January 1965 plaintiff's production had decreased to 20,000 gallons a month. Plaintiff claims production was curtailed approximately 60 to 70 percent because of the inability to store raw materials and finished goods. Plaintiff's treasurer testified:

> The period of October our records indicated that we had shipped approximately 125,000 gallons to the government. Shortly thereafter we were notified of a change in procedures whereby our production department, because of storage of finished goods and raw material, was unable to operate, and we dropped to as low as approximately 50,000 gallons for the month of November and December, and further during the period of January where we had built up large inventories, to as low as approximately 25,000 gallons for the month.

Plaintiff asserts that paragraph 16 of the contract schedule precludes the change in inspection procedures that GSA instituted. Interpretation of the meaning of contract language is a question of law. Under the Wunderlich Act standards, such an issue is for this court to decide independently as no finality is attached to a conclusion of law reached by the board.[15]

As plaintiff reads the contract, paragraph 16, typed into the schedule, is a special provision that supplements and controls the general inspection provisions in Standard Form 32 and GSA Form 1424a.

When viewed in the context of prior DOD and GSA procedures, and the practice of the parties in plaintiff's other contracts with GSA, plaintiff asserts paragraph 16 constitutes an agreement that plaintiff would perform all acceptance tests unless the conditions required by subparagraph H occurred. These conditions were that the " * * * Government verification testing indicates significant differences when checked against suppliers test reports * * *." The record is clear that GSA did not change its acceptance test procedures as to plaintiff in November 1964 because "significant differences" had been found as required by subparagraph H.

Plaintiff's interpretation of schedule paragraph 16 requires the conclusion that acceptance testing by the manufacturer is mandatory, unless the conditions of subparagraph H occur, and that GSA had bargained away its right to go to another, and more stringent, system of acceptance testing.

The board reasoned that paragraph 16 had no such effect. The board accepted GSA's contention that, although paragraph 16 permitted acceptance testing by plaintiff, no absolute right to such procedure was conferred and that GSA was not precluded from requiring com-

---

14. 67–1 BCA at 29,589.

15. 41 U.S.C. § 322 (1970), Standard Form 32, Article 12, Disputes.

plete testing of all supplies in its own laboratories prior to release for shipment.

The board's interpretation is persuasive. GSA's rights to change the method of inspection are defined in Standard Form 32, Article 5, GSA Form 1424a, paragraph 2, and schedule paragraph 16. All must be considered together and if possible read as an harmonious whole. Plaintiff's interpretation would require the deletion of that part of GSA's revision of Article 5(e) of Standard Form 32 which specifically provides "* * * in no event shall the Government's right to inspect and test completely any and all lots offered for delivery under the contract be waived." [16]

Paragraph 16 supplements and amplifies GSA's revised Inspection Article 5(e). It does not conflict with the general inspection clauses. Paragraph 16 provides explanatory details for acceptance testing when performed by contractor. It does not, however, by its terms, preclude GSA from going to another procedure that requires complete testing in its own laboratories. Such a result would require a quality assurance agreement between the parties, which plaintiff admits was not the fact. If paragraph 16 were intended to eliminate the Government's right to go to another acceptance procedure and inspect in its own laboratories, it should have so provided.

▮▮ It is clear that plaintiff and GSA, after the transfer from DOD, assumed that the procedures that had applied in the DOD would continue, and in fact GSA administered the paint contract so as to permit acceptance testing in the manner that had been practiced. Where the meaning of a contract's provision is ambiguous, performance of the parties under previous contracts containing the same type of provision is strong evidence of the parties' interpretation.[17] In the circumstances of this case, however, past practice and the conduct of the parties under other contracts have not been shown to be relevant or helpful. Here, the specific provisions of the contract vest in GSA the right to perform total or less than total inspection at varying practicable times, and the permission for acceptance testing by the manufacturer specifically precludes a waiver of this right. As a matter of law, the contract did not prohibit the change in acceptance testing that was instituted by GSA in November 1964.

▮ Unlike a decision on the question of law involved in interpretation of the meaning of the contract's provisions, the board's findings of fact are entitled to finality unless fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. Once it is ascertained that the board's findings of fact are supported by "substantial evidence" on its record as a whole, the view of the board will be sustained.[18]

The board made its findings of fact in the light of the principle that no penalty should attach where a change in inspection, after a contract is commenced, requires a longer time for performance.[19] The board also noted the requirement in the standard Inspection article that "[a]ll inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work." [20]

The board found that GSA's changed inspection procedures had a direct effect

16. GSA Form 1424a, paragraph 2, Inspection.

17. Minneapolis-Moline Co. v. United States, 149 F.Supp. 146, 149, 137 Ct.Cl. 790, 795 (1957).

18. Standard Form 32, Article 12, Disputes; United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); Marley v. United States, 423 F.2d 324, 329, 191 Ct.Cl. 205, 214 (1970); H & H Mfg. Co. v. United States, 168 Ct.Cl. 873, 877 (1964).

19. Aero-Fab Corp., 57–1 BCA ¶1243.

20. Standard Form 32, Article 5(c).

on plaintiff's " * * * total performance under all contracts, including curtailment of manufacturing plus inventory pile-up, with its attendant warehousing problems." [21] Notwithstanding its findings, however, the board concluded delays in GSA's new inspection procedures had not prevented plaintiff's performance under the terminated purchase orders. The terminated purchase orders had been received in the months of August through November 1964, and had performance due dates from October 27, 1964, to February 8, 1965. The board found:

> * * * While it is true that the switch-over to cómplete acceptance testing by GSA was ordered in November 1964 and thus occurred prior to the performance due date of one and at the most two of the terminated orders, the fact remains that the change in testing procedures could not have affected the terminated orders, since Appellant admittedly never did anything whatsoever respecting performance thereof. In other words, Appellant was never in a position to make the paint covered by any order available for inspection within 75 days after receipt of such order, and consequently could not meet the additional requirement for delivery within 15 days after notice of release by the inspector. Therefore, again despite what other result might obtain under a different set of facts, the Board here finds that the change in acceptance testing procedures does not constitute an excusable cause of delay in this appeal. [22]

This finding is supported by substantial evidence. Although the board, over GSA's objection, permitted plaintiff to introduce evidence relative to other contracts, the record does not contain specific information that relates inspection procedure changes on other contracts to the failure to produce for the terminated purchase orders. [23] It may be that inspection delays in other contracts resulted in inventory buildups and production curtailment that precluded commencement of production under the terminated purchase orders. The record, however, is bare as to precise details. No specific contract is identified, nor is there information about (1) due dates under such other contracts, (2) quantities and dates available for inspection, (3) quantities ordered to inventory, (4) elapsed times in inspection, (5) or dates of acceptance. There is no specific information that traces, as to other contracts, the sequence from inspection delay, to inventory buildup, to effect on factory production lines. Plaintiff has not shown on the record that the Government interfered with performance of the terminated purchase orders by the changed inspection procedures on other contracts.

In the absence of demonstrated adverse effect on plaintiff's performance, the board's finding that the Government had a right to invoke the provisions of the Default clause after plaintiff failed to make the paint called for by the purchase orders available for inspection within 75 days after receipt of the orders must stand.

GSA's adoption in November 1964 of complete Government acceptance testing in its paint contracts unquestionably complicated plaintiff's production problems. GSA's right to terminate the purchase orders for default produces a harsh result, particularly since plain-

21. 67–1 BCA at 29,589.

22. 67–1 BCA at 29,589–90.

23. 67–1 BCA at 29,585–86. The board stated :
 " * * * The Government objected to the introduction of evidence touching upon any contract other than the one in dispute. The Board overruled this objection on the ground that Appellant should be offered every opportunity to support one of its fundamental theses, to wit—that the Government, by an abrupt change in a pattern of inspection procedures which had persisted throughout various contracts and indeed into the term of the instant contract, had brought about conditions which had led to the default and which rendered same excusable. * * * "

tiff's predicament was compounded by GSA's administrative inefficiencies in the transfer to the new procedure. The context of GSA's procedure change raises the question of whether plaintiff's purchase orders were terminated because the general policy changed, and not because the contracting officer made an independent decision as to plaintiff's performance. The board, however, found that the evidence in its record was not sufficiently convincing to demonstrate that the purchase orders were terminated as a direct result of "general tightening" of GSA's inspection procedures. The board found:

> Stated differently, the preponderance of the evidence supports a finding that the Contracting Officer made an independent personal determination to terminate because of the outstanding defaults, whereas it does not furnish an adequate basis for concluding that his action was occasioned by a general policy decision dictated by other GSA officials (on the subject of the necessity for an independent, personal Contracting Officer's decision, see this Board's ruling in Appeal of Beals Plumbing & Heating, Inc., 64 BCA ¶ 4358).[24]

 The board has initial responsibility to determine issues of fact, and its determination is conclusive when supported by substantial evidence. Where, as here, there is substantial evidence to support the board's finding, a contrary finding may not be made even though another tribunal, with a viewpoint unaffected by the symbiosis that occurs when facts are resolved initially by an arm of the same agency that makes the contract, may have evaluated the evidence otherwise.

*Excessive Ordering and Priority Orders.* Plaintiff contends that the effects of GSA's excess ordering in July, August, and September, and priority pro-

duction orders, primarily on other contracts, when combined with the effects of the changed inspection procedures, caused delays that prevented production for the terminated purchase orders.

In July 1964, GSA's various supply depots abruptly increased the quantity of paint ordered under its outstanding requirements contracts. In June 1964, for example, plaintiff received purchase orders for 90,000 gallons of paint. Orders increased to 300,000 gallons in July 1964, were approximately 137,000 gallons in August 1964, and were approximately 133,000 in September. Plaintiff's production capacity, known to GSA, was approximately 140,000 gallons per month.

Plaintiff argued before the board that in July, August, and September 1964 GSA's purchase orders were about 800 percent in excess of the estimated monthly average for its outstanding contracts.[25] Specific evidence of the number of other outstanding requirements contracts, and the quantities estimated thereunder, however, is not to be found in the record. There is no way to determine from the record whether the ratio of estimated quantities to amounts ordered, under plaintiff's other requirements contracts, was reasonable or unreasonable.

The board reaffirmed the principle that in a requirements contract, GSA is not entitled to place unlimited orders, and that excess orders must be reasonable in relation to the estimates that were made at the time that the contract was negotiated. Such estimates provide a guideline to both contracting parties in contemplating performance anticipated under the contract.[26] With respect to the terminated purchase orders, the total estimated quantity was 36,930 gallons and the total quantity actually ordered was 45,955 gallons. The percentage of quantity ordered to estimates, according-

24. 67–1 BCA at 29,590.

25. 67–1 BCA at 29,594. In its reply brief in this case, plaintiff states that " * * it did not assume the risk of a demand for

material that was 300% in excess of stated requirements [p. 4]."

26. 67–1 BCA at 29,594.

ly, was approximately 125 percent. The board found such ratio reasonable.

The board concluded that the ordering peak that occurred in July 1964 under other contracts did not result in excusable delay with respect to the terminated purchase orders. Each contract amounted to a distinct obligation, and, on the facts, connection had not been shown between plaintiff's failure to perform and excess orders on other contracts. The board said:

&ast; &ast; &ast; Tying in performance of the instant contract to progress under the earlier contracts does not on the dominant facts afford any basis to warrant agreement in Appellant's claim that GSA's total ordering pattern gave rise to an excusable cause of delay. See Albert Furniture Co., 58–1 BCA ¶ 1622. As in Appeal of William Armstrong Smith Company, 66–1 BCA ¶ 5434, the Board believes that Appellant, taking an admitted calculated risk that it could handle all business involved, entered into contracts requiring production in excess of its plant capacity. As the Board said in *Smith*, "The risk of non-performance of contracts is Appellant's and not the Government's." [27]

Plaintiff had contracted to supply the paint *required* for GSA's storage depots. Inasmuch as GSA re-procured from other sources, after termination, paint originally ordered from plaintiff, the originally ordered quantities in fact were part of GSA's requirements.[28] There is no evidence that GSA over-ordered its needs.

■ Plaintiff, in accepting requirements contracts, accepted the risk that heavy demands under those contracts could strain its production capacities. Plaintiff did not provide details that would establish that GSA's excess orders in other contracts were unreasonable, and that such unreasonable amounts resulted in production excesses that prevented performances of the terminated orders.

■ Although all parties agree that under a requirements contract GSA could not order unlimited quantities and that orders must be reasonable in relation to estimates, plaintiff failed to establish that GSA's action with respect to the other contracts was beyond reasonable quantities or was directly related to the terminated purchase orders. The record does not support plaintiff's contention that a connection did in fact exist.

Similarly, plaintiff failed to connect GSA's priority orders under other contracts to delays in performance of the terminated purchase orders. The right to issue priority orders was an express right delineated in the Scope of Work clause of the contract. Plaintiff presented no specific evidence that identified the number of priority orders, the contracts involved, or traced their impact on its production problems.[29] The board found:

Appellant's President acknowledged that the direction to give priority to certain military orders had no direct effect on its manufacturing or production processes, but that it did preclude the maintenance of deliveries on a first-come first-served basis. On the conceded facts which obtain here, Appellant never reached the delivery stage, and consequently fairly cannot claim to have been affected detrimentally in any way by any priority directives which may have been issued.

Whatever the effect of compliance with priority directives might be un-

---

27. 67–1 BCA at 29,595.

28. The date that GSA re-procured from other sources is not in the record. The administrative claim was not made on plaintiff until July 23, 1969.

29. One telegram dated July 14, 1964, was introduced, which designated need for certain supplies as urgent. This telegram was received 7 days after award of the contract and 24 days before receipt of the first purchase order. The board concluded this telegram had no relevant connection with the terminations (67–1 BCA at 29,587).

der different factual circumstances, it seems clear that in this case the actions of the parties in relation thereto had no effect whatsoever on the terminated orders. Therefore, the Board rules that the evidence does not warrant a finding of excusability for non-performance on this particular ground.[30]

*Other Claims.* Plaintiff claimed that copper and cuprous and mercuric oxides, essential raw materials, were unavailable by reason of unforeseen supply shortages caused by declining production. Copper shortages were compounded by labor difficulties. The board found that plaintiff did not establish that it had taken steps prudently to insure access to necessary supplies. Although the contract had been awarded on July 7, 1964, and the first of the terminated purchase orders had been received on August 12, 1964, plaintiff did not attempt to obtain the materials known to be in short supply until mid-October. The board stated:

> * * * For Appellant to have waited until mid-October seeking supplies to fill orders having performance due dates beginning October 27, 1964, does not indicate, in the Board's judgment, that Appellant acted in a reasonably prudent and timely manner. The time to have screened the various possible sources of supply (not only the regular supplier) certainly antedated October 1964. Appellant did not do so, and hence cannot plead successfully impossibility of performance, since it has not proved that supplies would have been unavailable through established commercial channels had they been explored routinely and timely.[31]

■ The board's opinion reviews in detail the evidence presented by plaintiff as to its efforts to obtain supplies. The board's finding that plaintiff did not act prudently is supported by substantial evidence. By not acting prudently to ob-

tain materials in short supply, plaintiff was responsible for its own difficulties. Failure to obtain these supplies did not arise out of causes beyond the control and without the fault or negligence of the contractor.

Plaintiff claims that GSA affirmatively elected to continue the contractual relationship and to waive the delivery requirements. The first of the terminated purchase orders was received on August 12, 1964, and had a due date of October 27, 1964. Due dates on the other purchase orders ranged to February 8, 1965. Passage of time, continuous encouragement by GSA officials and failure to emphasize continued adherence to the delivery schedule are factors cited by plaintiff to evidence GSA's election.

Plaintiff held a series of meetings in the period from September 1964 to January 1965 with representatives of GSA. In these meetings, the contracting officer and GSA's quality control officials were advised about plaintiff's production difficulties.

It is clear that the parties discussed the possibility of terminating some of the purchase orders without liability. At a meeting in October 1964, plaintiff was requested to submit a list of all outstanding orders under all contracts so that GSA could consider the possibility of canceling out every order that could not be performed in the next 60 to 90 days. This list was submitted in December 1964.[32] The plaintiff made efforts to secure an agreement to cancel the outstanding purchase orders that it could not perform. Some of the purchase orders from GSA's regional offices in fact were canceled, but at the national level GSA's legal advisers held such relief was not permissible.

Notwithstanding this course of discussions, on February 10, 1965, without any prior written notice or oral notification, GSA terminated plaintiff's purchase orders for default. The possibility of a

---

30. '67–1 BCA at 29,587.

31. 67–1 BCA at 29,593.

32. 67–1 BCA at 29,590.

default termination had not been discussed. The board found: "The Contracting Officer admitted that Appellant was never given any indication that the orders in dispute were to be terminated for default until Appellant received the actual termination notice dated February 10, 1965." [33]

The board found that this course of conduct did not demonstrate that GSA officials had elected to forego the delivery schedule. Although the plaintiff had been encouraged to do the best it could, such encouragement the board decided did not establish that a new delivery schedule was contemplated as a result of the discussions with GSA officials. The board found:

It is true that GSA waited almost four months from the beginning of the initial delivery date before issuing the termination notice on February 10, 1965, and it is equally true that Appellant never was given any inkling prior to receipt of the termination notice that GSA would invoke this particular contractual privilege. Whatever might be said critically of the manner in which GSA handled this particular phase of its dealings with Appellant could not under any circumstances supply the lack of essential probative evidence indicating that GSA had acted in such manner as to set aside affirmatively the established delivery dates for the disputed orders. The fact that Appellant was seeking relief and that GSA discussed many times the possibility of affording such relief, does not in itself amount to a waiver of the right to call for delivery at the stipulated times.[34]

■ Plaintiff did not show affirmative action by GSA officials to waive the delivery schedule. In the circumstances, the time that passed is not sufficiently long to obligate the contracting officer to establish a new delivery schedule. There are no grounds in the record for a holding that the government waived the delivery schedule.[35]

On the question of law as to the meaning of schedule paragraph 16, the decision of the board was correct. The board's findings of fact on plaintiff's various claims that its default should be excused are supported by substantial evidence. This court's power to decide issues of fact contrary to findings of the board is narrowly circumscribed.[36] The administrative record in this case does not support such contrary findings. At the hearing on November 5, 1965, the board afforded every opportunity for plaintiff to submit such evidence as it possessed.[37] Plaintiff does not contend that new or additional evidence is available. At this late date, no useful purpose would be served by suspending this proceeding for further action by the board.

Defendant has counterclaimed for the excess costs incurred on re-procurement of the terminated items, in the amount of $9,820.07.[38] The Government's counterclaim, by stipulation, was not submitted to the board on the instant appeal.[39] Demand, moreover, was not made on plaintiff administratively until July 23, 1969. The contracting officer assessed excess costs of reprocurement against plaintiff. Thereafter, plaintiff filed a timely appeal from this determination, and that appeal is still pending before the board to await the outcome of the present case. Factual issues are apparently involved on this matter of reprocurement, and the court should not pass

33. 67–1 BCA at 29,590.

34. 67–1 BCA at 29,591. The board distinguished on the facts Lumen, Inc., 61–2 BCA ¶3210 and L. W. Foster Sportswear Co., 62 BCA ¶3364.

35. Panoramic Studios, Inc. v. United States, 413 F.2d 1156, 1162–1164, 188 Ct.Cl. 1092, 1102–1105 (1969).

36. See Koppers Co. v. United States, 405 F.2d 554, 558–559, 186 Ct.Cl. 142, 149–151 (1968).

37. See note 23 *supra.*

38. Defendant's Response and Cross-Motion for Summary Judgment.

39. See note 3, *supra.*

on defendant's counterclaim until the board has had the opportunity to determine those factual issues. The appropriate procedure is to suspend action here on the counterclaim until the timely completion of the administrative proceedings.

For these reasons, plaintiff's motion for summary judgment is denied and it is not entitled to recover. Conversely, defendant's cross-motion for summary judgment is granted with respect to plaintiff's claim. Dismissal of the petition will be withheld until determination of defendant's counterclaim, and proceedings in this court on the counterclaim are suspended until the completion of the administrative proceedings on the matter of excess reprocurement costs.

NICHOLS, Judge (concurring):

I concur in the result. As I read the Board, they would extend time for a delay caused by a change of inspection procedures, even under their construction of the various inspection clauses. This being so, the interpretation issue is more or less academic. If I had to construe the contract, I would be tempted to start out with the proposition that the clauses are inconsistent, but I then would be embarrassed by plaintiff's assertion that they are consistent. As I further read the Board, they clearly found that the change in inspection procedure did severely impede performance. What the Board decision really stands for, I think, is that the disputes clause procedure is unavailable when an interference with plaintiff's production results from arbitrary acts by the Government in the administration of other contracts, making it impossible for plaintiff to perform the contract in issue. To the Board, it was sufficient that the sudden change in inspection procedure did not apply to the contract before it, because plaintiff never tendered any articles for inspection under that contract.

It seems possible (though I do not so hold) that plaintiff would have fared better under the facts found with a breach claim. To me, the case of J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968), suggests that plaintiff's grievances are not wholly unremediable, though the grievance there was quite different in nature. There, as here, the parties assumed throughout it was a disputes clause case, and footnote 16 appears intended to exonerate the court from sponsorship of that position. A careful reading of Judge Davis' opinion and the cases he cites will raise doubts whether it really was a disputes clause case and whether the contract really provided *J. A. Jones Company* with its remedy as finally won, after long travail, in this court. The headnotes seem to indicate our then Reporter thought it was a breach case. We must evaluate the picture before us in the frame the parties have placed around it; while alternative breach counts are common in Wunderlich review cases, there is none here.

In Gresham v. United States, Ct.Cl., 470 F.2d 542, decided today, we deal with another instance of sudden and arbitrary change in a rule of contract administration, affecting simultaneously numerous contracts. Both changes were the result of a rediscovery by the Government of a right, disused for a time, which supposedly it had all along. I do not urge that either decision is a precedent to govern the other, nor is there any necessary inconsistency between them, though in some respects *Allied Paint* has the more appealing case. Our commissioner sheds tears for *Allied Paint* and regards GSA with undisguised reprobation. If he were of an earlier generation of the judiciary, he would no doubt go on to proclaim that hard cases make bad law. And indeed they do.

The subject deserves further study as a branch of contract jurisprudence peculiar to itself, and the resolution of more satisfactory answers.