**WILLIAM GREEN CONSTRUCTION COMPANY, INC. and United States Fidelity & Guaranty Company**

v.

**The UNITED STATES.**

**No. 124–72.**

United States Court of Claims.
May 11, 1973.

James V. Dolan, Washington, D. C., for plaintiffs; Stanley C. Morris, Jr., Washington, D. C., attorney of record. Richard A. Behrens, Michael Malley and Steptoe & Johnson, Washington, D. C., of counsel.

Judith Ann Yannello, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

### ON DEFENDANT'S MOTION TO DISMISS THE PETITION

DAVIS, Judge:

Three separate government construction contracts are interlaced in this case. In November 1964 plaintiff William Green Construction Company (Green) agreed with the General Services Administration to build a women's residence hall at Howard University in the District of Columbia (the Howard University contract). About the same time Green also contracted with GSA to construct a Post Office and Federal Office Building in Portsmouth, New Hampshire (the FOB contract). A year and one-half later, the same agency arranged with plaintiff Green to erect the National Training School for Boys in Morgantown, West Virginia (Training School contract). Plaintiff United States Fidelity & Guaranty Company (USF & G) was the surety on the Howard University and FOB contracts; another company was surety on the Training School agreement. Green was also working, during this period, on three nonfederal projects on which USF & G was surety.

In 1965–1966, during performance of the Howard University work, the contractor and the defendant had a serious dispute whether certain of the government specifications were defective and impossible to carry out. When Green refused on that ground to go forward, the contracting officer terminated for default. Green challenged this determination, insisting that its inability to proceed was justified by the defects in the defendant's requirements.

In the discussions which followed, defendant indicated that it intended to set off, against amounts which would be owing on the other two of Green's federal contracts, the liquidated damages and excess completion costs assessable with respect to the just-terminated Howard University agreement. Green responded that such set-offs were improper—because the default-termination was unwarranted—and would make it financially impossible to proceed with completion of the other two contracts, and, more than that, the contractor's entire business would be destroyed. For this reason, Green and USF & G asked the GSA to isolate the Howard University dispute and not to impose set-offs, but the Government refused to make such a commitment.

Shortly after the Government had made it clear that it fully maintained its right of set-off, but before any set-off had actually occurred, Green informed GSA that, because of the threat to reduce payments on the other projects, it was financially unable to, and would not, proceed with the FOB and Training School contracts. These two agreements were then terminated by the Government for default. USF & G completed the FOB work, and apparently the other surety did the same for the Training School contract. Green likewise failed to complete the three nonfederal contracts it had, and went out of business.

Green appealed to the General Services Board of Contract Appeals from the default-termination of the Howard University contract, but it never sought review by the Board of the defaults with respect to FOB and Training School. The Howard appeal asked, not only for the conventional modern adjustment for an improper default-termination,[1] but also for damages for losses on FOB and Training School, as well as on the nonfederal projects, and for loss of Green's business as a whole. Because of the inclusion of these items of recovery, the Government moved the board to dismiss the appeal as for "breach of contract" and "unliquidated damages", beyond the board's authority. In 1968 the board partially granted this motion, dismissing all claims except that for an equitable adjustment under convenience-termination standards.

Later, in 1971, the parties stipulated before the board that Green "was not in default at the time it received notice of the termination [of the Howard University contract] and the Government concedes the termination for default was erroneously made by the contracting officer. The appeal, therefore, should be granted as defined by the prior decisions of the Board in this case." The GSBCA then found that the contractor's "right to proceed under the contract was improperly terminated for default", and remanded to the contracting officer to determine the equitable adjustment for the unreimbursed costs of performing the Howard work. The stipulation expressly provided that "any equitable adjustment under the contract shall not be prejudicial to [the contractor's] right to proceed in the Court of Claims for additional damages not the subject of such equitable adjustment." GSBCA No. 2114, 71–2 BCA ¶ 9116.

In 1972 Green and USF & G brought this action, alleging what we have thus far set forth, asking for the large damages (over $2,700,000) the board had dismissed from the Howard appeal, and claiming that those damages are recov-

---

1. The Howard contract provided that, if the default-termination was erroneous, the contractor would be entitled to an equitable adjustment—the equivalent of treatment as a convenience-termination. *See infra.*

erable on the theory that the United States breached all three of Green's federal contracts. Count I of the petition asserts the full claim as a breach of the Howard contract, while Count II bottoms the very same claim on alleged breach of the FOB and Training School agreements. Defendant has moved to dismiss the petition for failing to state any proper claim.

We think that the claimants do not have a "breach" claim against defendant on any of the three contracts, but that plaintiff Green does have a right to a convenience-termination type of equitable adjustment, under all three of them, and that such adjustments should be awarded administratively. We discuss the three agreements *seriatim*.

■ *Howard University contract* (*Count I*): The defendant's notice of default-termination of the Howard contract triggered the default-termination clause which provided that, if it was determined for any reason "that the Contractor was not in default under the provisions of this clause", or that "the delay was excusable", the matter was to be treated as a convenience-termination if the contract contained a convenience-termination article, and, if not, the contract was to "be equitably adjusted to compensate for such termination." We have held that the latter alternative calls for the general equivalent of a convenience-termination award. General Builders Supply Co. v. United States, 409 F.2d 246, 187 Ct.Cl. 477 (1969).

■■ It follows that when the GSBCA determined that Green's right to proceed was wrongfully ended, and remanded for an appropriate adjustment, the contractor received the maximum to which it was entitled under the contract. There is no present complaint as to the amount of the equitable adjustment, and plaintiffs do not contend that such an award can or should cover the types of consequential damage they seek here. The petition suggests, however, that a breach claim for a wrongful default-termination somehow survived for these additional items of recovery.

■ But it is very plain under our decisions that the administrative remedy is the only one available to the contractor. Green does not retain a "breach" claim, for an improper default, which can be brought in court and through which a supplemental award can be obtained. *See* General Builders Supply Co., *supra*, 409 F.2d at 248 n. 3, 187 Ct.Cl. at 480 n. 3; G. C. Casebolt Co. v. United States, 421 F.2d 710, 712, 190 Ct.Cl. 783, 486–487 (1970). The exclusive remedy "under the contract" substitutes for the "breach" claim which would otherwise exist, and becomes the claimant's sole form of relief. The measure of recovery for a convenience-termination—costs incurred, plus a reasonable profit on work performed—is an adequate replacement for the common-law cause of action. *See infra.*

■ It is worth noting, in addition, that in any event the type of consequential damage for which plaintiffs now press could not be obtained under Count I even if there were no such default-termination clause in the contract and this suit were properly one for common-law breach for wrongful cancellation of the Howard University pact. On the face of the petition it was not the wrongful termination itself which caused either Green's inability to proceed on the other two federal contracts, or the stoppage of work on the three nonfederal projects, or plaintiff's eventual going-out-of-business, but the subsequent and separate threat of set-offs against payments owing on the FOB and Training School projects. Whatever else those threats may have been, they were in no way violations of the Howard contract, nor were they directly or integrally linked to the Howard default termination. They were, instead, independent acts of the Government directed to the other two federal projects.

Accordingly, defendant is quite right that Count I fails to state any claim at all and must be dismissed *in toto*. The equitable adjustment which Green is receiving, through the administrative pro-

ceedings, is all that it merits with respect to the Howard contract.

■ *FOB contract (Count II)*: A. Even if the default-termination of the FOB agreement was invalid, Green should have appealed to the GSBCA, just as it sought review of the Howard termination. That was the channel expressly marked out by the contract and it should have been followed. If the FOB termination was improper, an equitable adjustment would be made under that contract which embodied the same default-termination form as the Howard agreement.

Plaintiffs try to avoid this conclusion by a number of arguments which we must reject. The first is that the claim in Count II is not for wrongful termination but for anticipatory breach of the FOB contract, through refusal to make progress payments. This is but a choice of phrasing to camouflage the irrefutable fact that the only detriment which came, or could come, to plaintiffs would be through a wrongful default-termination. Neither claimant suffered harm from the mere threat to withhold payment; neither would have suffered the harm charged from an actual withholding, if that is all there were. The injury could only come if the Government insisted that plaintiffs continued to have obligations under the FOB contract. If, for instance, the GSA had acquiesced (after the set-off threat) in Green's abandonment of the FOB project, the denial of progress payments would not interfere with performance because there would be no further work to be done or paid for. A failure to issue a default-termination would amount to an acquiescence in abandonment. *Cf.* Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 201 Ct.Cl. —— (1973). Thus, it was only the defendant's insistence, via the default-termination notice, that plaintiffs continued to have obligations under the FOB contract which precipitated any of the harms alleged. That was the heart of the matter.

As in Allied Paint Mfg. Co. v. United States, 470 F.2d 556, 200 Ct.Cl. —— (Dec. 1972), the contractor could have attacked the termination, through an appeal to the GSBCA, on the ground that other acts of the Government (*i. e.*, the threats of set-off) excused Green's failure to proceed.[2] Another comparable case is Nolan Bros., Inc. v. United States, 405 F.2d 1250, 186 Ct.Cl. 602 (1969), in which we held that a convenience-termination subsumed and obviated an independent breach claim for defective design. We pointed out, in words directly applicable to the present case, "If the Government, as it might have done, had terminated the contract for default because plaintiff lagged (on account of the defective specifications) and the default was found excusable (as due to the defendant's own fault), the termination would be converted, under the default clause, into a convenience-termination * * * *", with the plaintiff recovering costs incurred plus a measure of profit, but not unearned profits. 405 F.2d at 1253, 1255, 186 Ct.Cl. at 607, 609–610. Plaintiff's so-called "breach" claim has, in short, no viability independent of the validity of the default-termination, and that could be readily challenged through the "disputes" procedure.[3]

2. In *Allied Paint Mfg. Co.*, as here, the contractor's position was that the default-termination was improper because wrongful acts of the GSA in the administration of other contracts adversely affected the claimant's ability to perform all of its contracts, including those terminated.

3. Plaintiffs complain that in order to obtain relief from the FOB and Training School defaults, they would have to show that the Howard default was improper—and "only under the Howard University contract could Green obtain the threshold determination (setting aside the Howard default) which was essential to obtaining any relief" under the other two agreements. But there was nothing to prevent Green from asking the GSBCA to suspend proceedings in the FOB and Training School cases to await the Howard determination. That is a very common practice where a significant issue in one matter depends upon the resolution of another case.

A second of claimant's positions is that the entire termination-and-disputes remedy was aborted before the default notice. In Nolan Bros., Inc., *supra*, 405 F.2d at 1255 n. 5, 186 Ct.Cl. at 609 n. 5, we set apart "a case in which the contractor treats a government breach of warranty as ending the entire contractual relationship before the defendant attempts to exercise its right of termination." Plaintiffs say that that is what happened here—that the whole contract was effectively ended before the default-termination—but their current stance is conclusively refuted by the significant fact that USF & G undertook to complete the FOB project after the termination. If the contract was not subsisting at that time, neither Green nor USF & G would have been under any obligation; the existence of the contract was the essential predicate for the surety's agreement to complete. As in *Nolan*, we cannot see the plaintiffs had put an end to, or thought that they had put an end to, the contract before the Government invoked the default clause.

The third point is that the set-off threats constituted a cardinal change, by effectively deleting the progress payment provisions of the FOB contract, and that a cardinal change is redressable only in court, not administratively. *See* Edward R. Marden Corp. v. United States, 442 F.2d 364, 194 Ct.Cl. 799 (1971). We do not agree that it is a contract change of any kind—cardinal or ordinary—for the Government to set-off against progress payments (let alone merely threatening to set-off) a federal claim on another contract (with the same contractor) which is believed in good faith, but mistakenly, to be valid. This is simply an exercise of the established right of set-off (*see* United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Burlington Northern Inc. v. United States, 462 F.2d 526, 199 Ct.Cl. 143 (July 1972)), which is not transformed into something else because the defendant's claim turns out later to be without merit.

In any event, and assuming for argument's sake that the threats of set-off did equal a cardinal change excising the progress-payment provisions, it does not follow that such a "breach" claim would be any different from the "breach" claim in this case for simple violation of the progress-payments clause. As we have pointed out, that claim is swallowed up by the default-termination which was the event causing plaintiffs' detriment. Violation of the payments article, or even its deletion, would not have brought about the chain-of-events asserted by Green and USF & G if it were not for the default-termination. From claimants' viewpoint that was the real villain in the drama, whom they should have pursued on his own scene.

Lastly, we are told that an equitable adjustment of the convenience-termination type does not give full enough relief for the injuries suffered, and therefore plaintiffs should be allowed to seek, through this court, the part of the remedy which the administrative award cannot give them. The answer is that the premise is incorrect. "The only substantial difference between the sum calculated under" equitable adjustment or convenience-termination standards "and the amount recoverable in a common law action for contract breach is the noninclusion in the former of anticipated but unearned profits." Nolan Bros., Inc. v. United States, *supra*, 405 F.2d at 1253, 186 Ct.Cl. at 607. This exclusion from relief of unearned profits is a settled policy which has long been accepted and enforced. 405 F.2d at 1254, 1255, 186 Ct.Cl. at 608–609, General Builders Supply Co. v. United States, *supra*, 409 F.2d at 251, 187 Ct.Cl. at 485–486; G. C. Casebolt Co. v. United States, *supra*, 421 F.2d at 713, 190 Ct.Cl. at 788. And even in a common-law suit there would be no recovery for general loss of business, the claimed loss of the entire Green net worth, and losses on the non-federal work—such damages are all deemed too remote and consequential. *See* Ramsey v. United States, 101 F.Supp. 353, 357–358, 121 Ct.Cl.

426, 433–435 (1951), cert. denied, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952); Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 738 (1964); Specialty Assembly & Packing Co. v. United States, 355 F.2d 554, 567, 568, 174 Ct.Cl. 153, 175 (1966). The conclusion must be that the administrative remedy is, as we have already said, a full and permissible substitute for the award of damages under the former "breach" claim.

Plaintiffs err therefore in seeing themselves as under no duty to proceed administratively. On the contrary, Green should have appealed from the default-termination of the FOB contract and obtained its relief in that fashion.

■ B. Not unexpectedly, the defendant suggests that, having failed to appeal, Green is now barred forever. We follow, instead, the rule of Zidell Explorations, Inc. v. United States, 427 F.2d 735, 737–738, 192 Ct.Cl. 331, 335–336 (1970), that, if the circumstances warrant, we will give a contractor who has failed to appeal a second chance. The time-limit for appeals to contract appeals boards is not beyond enlargement (Maney Aircraft Parts, Inc. v. United States, 453 F.2d 1260, 197 Ct.Cl. 159 (1972); Monroe M. Tapper & Associates v. United States, 458 F.2d 66, 198 Ct.Cl. 72 (1972)), and the Act of August 29, 1972, Pub.L. No. 92–415, 86 Stat. 652, gives us power to remand to a board "with such direction as it [the court] may deem proper and just."

To our mind this is a case, like Zidell, in which we should not rigidly hold the contractor to its original decision not to appeal. The three federal contracts were linked in plaintiff's mind and it

may have considered the enlarged recovery it originally sought in the Howard administrative proceedings to be a sufficient method of covering all three determinations.[4] Then, too, plaintiff may well have been misled by its view, still strenuously espoused here, that its claims are entirely "breach" claims for court trial. We referred in Zidell to the great confusion since United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), over which cases properly fall "under the contract" and which are for "breach". This case is a prime exemplar. Especially since plaintiffs appear to have a valid right to substantial further relief, they should not be eternally punished for their initial mistaken choice of procedure.[5] The case should go to the GSBCA for processing under the default-termination clause of the FOB contract.

■ C. There has, as yet, been no decision that the termination of the FOB agreement was improper, but we think that on the undisputed facts there is no doubt that it was, and we now so hold as a matter of law since the board could not validly decide otherwise. All must now accept the Howard termination as incorrect; Green was not in default on that project and the default-termination was erroneously made by the contracting officer. There were, accordingly, no liquidated damages and no excess construction costs which could properly be offset against the FOB and Training School contracts. That threats to offset were nevertheless made is undisputed and indisputable. The connection is also clear between those threats and Green's stopping work on the FOB and Training School projects. Defendant does not even hint that this stoppage was unrelated to, or had some cause other than,

---

4. The FOB and Training School contracts were terminated in 1966. It was not until 1968 that the GSBCA dismissed, from the Howard appeal, the claims relating to the other two contracts. By that time the time for appealing the FOB and Training School defaults had long expired.

5. The cases in which we refused contractors a second choice—Briscoe v. United States, 442 F.2d 953, 966, 194 Ct.Cl. 866, 887–888 (1971); Richardson Camera Co. v. United States, 467 F.2d 491, 199 Ct.Cl. 657 (1972)—presented very different facts and circumstances.

the menace of set-off.[6] Nor is there any suggestion that plaintiffs are mistaken when they say they warned the defendant that they would need the progress payments on the two contracts, without substantial diminution.[7] There is, moreover, not the slightest basis for thinking that Green should (or could) have gotten the necessary money from other sources.

■ It follows, we think, that Green's refusal to proceed on FOB must now be held to be excused. A serious threat in these circumstances to withhold necessary progress payments because of an erroneous off-set claim on another contract is an act of the Government, not attributable to the contractor, which excuses whatever technical default there may be. Construction contractors cannot be expected to continue working if the Government improperly holds back on substantial interim payments which enable the project to proceed. Cf. Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 167 Ct.Cl. 604 (1964); Pigeon v. United States, 27 Ct.Cl. 167, 175–176 (1892); Overstreet v. United States, 55 Ct.Cl. 154, 173–174 (1920).[8]

■ D. The equitable adjustment to which Green is entitled under the FOB contract includes, not only the costs it incurred itself before termination, but also USF & G's excess costs in completing the project. Defendant admits [9] that, when a default-termination is converted to a convenience-termination, the contractor is entitled to any liquidated damages and reprocurement costs paid following the termination. That would include, since the surety stands here in the contractor's place,[10] USF & G's unreimbursed excess completion costs, if appropriate and reasonable. Cf. J. D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1320–1327, 197 Ct.Cl. 782, 790–803 (1972). The equitable adjustment called for by the contract is flexible enough to cover that item, to the extent the contractor has incurred such costs as a result of the wrongful termination.

■ On the other hand, as we have already indicated, USF & G's costs of completing the three non-federal contracts, and the loss of Green's net worth, are not proper items for an equitable adjustment under the FOB and Training School contracts.

*Training School contract (Count II)*: What we have said as to the FOB contract controls the Training School agreement. USF & G was not surety for that work and the petition therefore does not ask for recovery of amounts expended by the other surety (which is not a plaintiff here). But if the other surety has a claim, through Green, with respect to completion of the Training School comparable to that of USF & G for completion of FOB, the Training School equitable adjustment should take account of it if presented.

6. The petition reproduces a letter from Green committing it to continue performance on the FOB and Training School contracts provided that GSA agreed not to offset claims unrelated to those two projects.

7. The petition sets forth a pre-termination letter from counsel for USF & G to GSA saying explicitly that "if the Government off-sets its claims arising out of the Howard University contract against funds earned by the Green Company on other contracts, the Green Company will be unable to proceed with work on the contracts not in dispute for lack of funds to pay laborers and materialmen."

8. Green might have waited until a set-off was actually made, but the GSA's intention had been made very plain and there apparently was planning and preparation work to do which would be entirely wasted if plaintiffs were not going forward once a set-off was actually made. In the circumstances we do not think Green was compelled to await an actual set-off.

9. See Defendant's Reply to Plaintiffs' Response In Opposition to Defendant's Motion to Dismiss, at 9 n. 6.

10. USF & G has paid all laborers and materialmen, and Green is liable to USF & G for the full amount of the loss suffered in completing the FOB contract.

Defendant's motion to dismiss the petition is fully granted as to Count I, but as to Count II the court makes the following disposition: (a) the petition is dismissed to the extent that a claim for "breach" of the FOB and Training School contracts, triable in court, is stated; (b) the petition is construed as alternatively seeking equitable adjustments under those two contracts; [11] and (c) the request for such equitable adjustment is remanded to the GSBCA under P.L. 92–415, 86 Stat. 652, this opinion, and General Order No. 3 of 1972, for appropriate administrative proceedings. Counsel for the plaintiffs is designated as the responsible reporting attorney under paragraph 9(a) of General Order No. 3.

---

11. Count II demands, in the alternative, "such other relief as the court may deem appropriate."