OPINION
This case arises from a contract dispute between Plaintiff-Appellant, Jeffrey B. Peterson Associates ("Peterson"), and Defendant-Appellee, Dayton Metropolitan Housing Authority ("DMHA"). In July, 1995, DMHA asked for bids to replace the roofs, fascia, gutters, and down spouts on eight residential units located at Channingway Court, in Huber Heights, Ohio. The bid request resulted from a violation notice issued to DMHA by the City of Huber Heights. Unfortunately, the original bid amounts exceeded the limit for small procurement contracts, and the project had to be re-advertised as a large procurement contract. DMHA then received another round of bids in September, 1995.
Peterson was awarded the job on the second round, and entered into a contract with DMHA on September 19, 1995. According to the contract, work was to begin on October 16, 1995, and was to be completed within ninety days. The total contract amount was $57,148. After the award, Peterson began work, but a number of problems caused delay. Ultimately, the work was not finished on time, and DMHA terminated the contract for default on June 17, 1996.
Subsequently, Peterson filed suit against DMHA for breach and wrongful termination of the contract. In particular, Peterson requested damages for overhead expenses, lost profits, indemnification costs due to Peterson's surety, money due for work performed on the project, prejudgment interest, attorney fees, loss of productivity, and loss of bonding capacity. DMHA filed an answer, claiming that default was proper because Peterson had failed to complete the contract.
The case was referred to a magistrate for findings of fact and conclusions of law on all issues of law and fact. After hearing evidence, the magistrate issued a decision on November 7, 1997, finding that DMHA had breached the contract. However, the magistrate went on to conclude that Peterson's damages were limited by Section 34(b) of the contract, which applied when contracts were terminated for convenience. Accordingly, the magistrate recommended that Peterson should be awarded damages in the amount of $26,292.66, plus statutory interest. This amount included the last pay application of $13,868.80, $1,783.45 in stored materials, home office overhead of $5,274.41, termination expenses of $1225, and retainage of $4,187.[1] The magistrate rejected Peterson's remaining claims for damages, because Section 34(b) did not allow recovery of damages for loss of bonding ability.
Additionally, the magistrate found that Peterson was entitled to "reasonable attorneys fees expended to litigate this matter." However, the magistrate did not recommend awarding any attorney fees, because no evidence had been presented as to their reasonableness.
On June 11, 1998, the trial court affirmed the magistrate's decision, except for the issue of attorney fees. This issue was recommitted for the magistrate "to determine adequate fees." The court also addressed the issue of prejudgment interest, which had been raised in Peterson's objections. In this regard, the court found that Peterson was made whole by the damages award and was not entitled to prejudgment interest.
Although an immediate appeal was taken from the trial court's decision, the parties later asked us to stay the appeal and remand the case for a decision on attorney fees. We agreed to do so, and the magistrate then held an attorney fee hearing on October 19, 1998. However, this time the magistrate found that Section 34(b) limited Peterson's attorney fees to those incurred before litigation. Accordingly, the magistrate awarded attorney's fees of only $3,070.50. The trial court then adopted this decision in full on June 4, 1999.
Peterson now appeals both the June 11, 1998 and June 4, 1999 decisions of the trial court, and raises the following assignments of error:
 I. The trial court erred when it did not find that the Contracting Officer's termination of the contract was arbitrary, capricious and an abuse of discretion.
 II. The trial court erred when it interpreted the contract as limiting Appellant's damages.
 III. The trial court erred when it failed to award Peterson all of its attorneys fees and expenses expended to litigate this matter.
 IV. The trial court erred when it failed to award Appellant prejudgment interest on all damages recovered.
After reviewing the record and assignments of error, we find the first and third assignments of error without merit. The second assignment of error has merit in part, and the fourth assignment of error also is meritorious. Accordingly, the trial court decision will be affirmed in part, reversed in part, and remanded for consideration of two issues. An explanation of our opinion follows.
 I
As we mentioned, Peterson alleges in the first assignment of error that the trial court erred in not finding the contract termination to be arbitrary, capricious, and an abuse of discretion. However, our review of the record indicates that neither the magistrate nor the trial court ever specifically considered this issue.
In this regard, we note that Peterson filed a motion for partial summary judgment on April 30, 1997, asking for summary judgment on liability only. In the motion, Peterson argued that termination for default was wrongful because DMHA could not reasonably justify the termination. In particular, Peterson focused on the fact that the contracting officer (DMHA Executive Director, Roland Turpin) abused his discretion by failing to make any investigation. Peterson additionally relied on the fact that DMHA failed to consider whether project delays were the result of excusable delay.
DMHA responded by noting that the Executive Director properly relied on the judgment of others in the administrative hierarchy. Further, DMHA contended that Peterson's lack of diligence and poor workmanship justified termination for default.
Subsequently, the magistrate denied the motion for summary judgment. In the decision, the magistrate focused solely on Section 32(a) and (b) of the contract, which allowed DMHA to terminate the contract if the work was not timely performed. Regarding this issue, the magistrate noted that there was no dispute about untimeliness, i.e, the work was not finished by the contract deadline. However, the magistrate then commented that DMHA did not have the right under the contract to terminate for default: 1) if the delay arose from unforeseeable causes beyond the control and without the fault of the contractor; and 2) the contractor timely notified DMHA of the causes of the delay. After receiving timely notice, DMHA was contractually required to ascertain the facts and extent of delay, grant an extension if warranted, and issue a written decision. The magistrate found genuine issues of fact concerning the causes for the delay and whether both parties met the requirements of the contract for the termination process. However, the magistrate did not comment on abuse of discretion, arbitrariness, etc.
At trial, both sides made opening statements, but neither side mentioned abuse of discretion in connection with damages. Instead, Peterson focused on whether the delay was excusable and whether DMHA was justified in terminating for default (without specifically mentioning abuse of discretion). By contrast, DMHA argued that Peterson was partly responsible for the delay, that Peterson failed to set up a reasonable completion date for the contract, and that DMHA had no choice but to terminate the contract.
After the hearing, both sides filed post-trial briefs. Peterson's brief repeated what had been said to support summary judgment, but some sections were added, addressing the remarks the magistrate had made about whether each side met contract requirements for the termination process. Additionally, Peterson included a section on damages, but did not discuss either termination for convenience or other limits on damages.
DMHA also repeated its previous arguments in its post-trial brief, i.e, DMHA argued that the delay was not excusable and that the contract was properly terminated. However, for the first time, DMHA mentioned termination for convenience. In this regard, DMHA pointed out that if the court decided that termination was improper, Section 32(c) of the contract converted the default termination into a termination for convenience. DMHA further argued that damages in this event would be determined under Section 34(b) of the contract.
Subsequently, on November 11, 1997, the magistrate issued a decision, finding that DMHA failed to provide Peterson with written notification of proposed change orders under the contract. Additionally, the magistrate decided that DMHA did not respond as required by the contract to Peterson's notices of delay. Accordingly, the magistrate held that "[b]ecause Defendant did not proceed pursuant to the language of the contract, it had no basis for terminating Plaintiff's contract." As a further matter, the magistrate found that Peterson was not at fault for the delay and had established grounds for damages.
However, the magistrate also observed that Section 34 of the contract limited recoverable damages. In this regard, the magistrate appears to have relied on the following provisions.
32. Default
 (a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with the diligence that will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within this time, the Contracting Officer may, by written notice to the Contractor, terminate the right to proceed with the work (or separable part of the work) that has been delayed. In this event, the PHA/IHA may take over the work and complete it, by contract or otherwise, and may take possession of and use any materials, equipment, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the PHA/IHA resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the PHA/IHA in completing the work.
 (b) The Contractor's right to proceed shall not be terminated or the Contractor charged with damages under this clause if —
 (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include (i) acts of God or of the public enemy, (ii) acts of the PHA/IHA or other governmental entity in either its sovereign or contractual capacity, (iii) acts of another contractor in the performance of a contract with the PHA/IHA, (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers; and
 (2) The Contractor, within 10 days from the beginning of such delay (unless extended by the Contracting Officer) notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, time for completing the work shall be extended by written modification to the contract. The findings of the Contracting Officer shall be reduced to a written decision which shall be subject to the provisions of the Disputes clause of this contract.
 (c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been for the convenience of the PHA/IHA.
(Emphasis added).
Section 34 of the contract (Termination for Convenience) states as follows:
 (a) The Contracting Officer may terminate this contract in whole, or in part, whenever the Contracting Officer determines that such termination is in the best interest of the PHA/IHA. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which the performance of the work under the contract is terminated, and the date upon which such termination becomes effective.
 (b) If the performance of the work is terminated, either in whole or in part, the PHA/IHA shall be liable to the Contractor for reasonable and proper costs resulting from such termination upon the receipt by the PHA/IHA of a properly presented claim setting out in detail: (1) the total cost of the work performed to date of termination less the total amount of contract payments made to the Contractor; (2) the cost (including reasonable profit) of settling and paying claims under subcontracts and material orders for work performed and materials and supplies delivered to the site, payment for which has not been made by the PHA to the Contractor or by the Contractor to the subcontractor or supplier; (3) the cost of preserving and protecting the work already performed until the PHA/IHA or assignee takes possession thereof or assumes responsibility therefor; (4) the actual or estimated cost of legal and accounting services reasonably necessary to prepare and present the termination claim to the PHA/IHA; and (5) an amount constituting a reasonable profit on the value of the work performed by the Contractor. (Emphasis added)
(Emphasis added).
Based on these provisions, the magistrate awarded some damages, but rejected Peterson's claims for loss of bonding capacity. After the magistrate's decision was issued, Peterson filed a motion for reconsideration, asking for clarification of the magistrate's decision. One matter mentioned in Peterson's motion was the limitation of damages under the termination for convenience clause. Specifically, Peterson pointed out that federal courts had recognized a judicial exception to such limitations and had allowed full breach of contract damages where a public owner acted in bad faith or abused its discretion in invoking a termination clause. The other matters raised in the motion for reconsideration were bonding damages, a request for leave to put on evidence about attorney fees, and the fact that the magistrate's decision was silent about prejudgment interest.
On November 21, 1997, the magistrate overruled the motion for reconsideration, stating that the issues were proper grounds for objections and were more appropriately addressed by the trial judge. The magistrate also noted that reconsideration was not allowed by either the local rules or the Rules of Civil Procedure. On the same date, Peterson filed objections to the original magistrate's decision, raising five issues, including the fact that damages are not limited where the government abuses its discretion.[2] As we mentioned earlier, the trial court then adopted the magistrate's decision in part and recommitted it in part. As an initial matter, the trial court noted that Peterson had raised the following six objections to the magistrate's decision:
 1) Damages are not limited by the limitations provisions found in clause 34(b); 2) Magistrate failed to include items of damage that fall within the ambit of clause 34(b); 3) Magistrate failed to consider the implication of counts one and two of the complaint; 4) Magistrate failed to include the anticipated expenses of expert Carl Meglan; 5) Magistrate failed to include a recovery of attorney's fees; and 6) Magistrate failed to award pre-judgment interest on the award.
Unfortunately, in considering these objections, the trial court made no mention of abuse of discretion. Instead, the court held that DMHA breached the contract by not adhering to the requirements enumerated in the contract. The court then went on to apply the damages clause in Section 34(b) and affirmed the magistrate's decision on damages, without mentioning Peterson's abuse of discretion argument. However, the court did recommit the issue of attorney fees because the magistrate's decision was silent on that point.
Generally, if the trial court fails to mention or rule on a motion or an objection, we presume that the objection or motion was overruled. Dayton Monetary Assoc. v. Becker (1998),126 Ohio App.3d 527, 539, and Shaffer v. Shaffer (1996),109 Ohio App.3d 205, 212. However, applying this rule in the present situation is somewhat troubling. Specifically, the magistrate heard the testimony and would have been the appropriate one to evaluate the question of whether DMHA acted arbitrarily or abused its discretion. This matter was also raised at a time when the decision could have been easily modified, if needed. And, contrary to the magistrate's conclusion, interlocutory orders are subject to change and may be reconsidered, upon the court's own motion or that of a party. See, e.g., Barrett v. Waco Internatl.,Inc. (1997), 123 Ohio App.3d 1, 11; Hoecker v. Dayton Montgomery Co. Park Dist. (Sept. 12, 1995), Montgomery App. No. 15141, unreported, p. 1; and D'Agastino v. Uniroyal-Goodrich TireCo. (1998), 129 Ohio App.3d 281, 288. In this regard, we note that the magistrate's decision was clearly interlocutory, since decisions on referred matters are not even effective until they are adopted by the trial court. See Civ.R. 53(E)(4)(a), andBond v. Bond (Dec. 15, 1998), Franklin App. No. 98AP-356 and 98AP-1043, p. 2.
However, as we said, instead of considering the argument about abuse of discretion, the magistrate deferred to the trial court. The trial court then made no specific comment on the point. As a result, despite the general presumption, we are hard-pressed in this particular instance to presume that anyone on the lower court level actually considered the matter. Therefore, in our opinion, the real issue in this appeal is whether the trial court erred in failing to consider if DMHA acted arbitrarily or abused its discretion in terminating the contract. According to Peterson, abuse of discretion is material because it would relieve Peterson of the damages limitations in Section 34(b) and would allow a broader recovery of common law damages for breach of contract. In this context, Peterson relies on federal law, which allegedly allows contractors to recover full common law contract damages if the government has acted arbitrarily or in bad faith.
Our starting point for analysis is to decide what law should apply. Both the magistrate and trial court relied solely on Ohio common law in their decisions. Since all relevant contacts were with this state, Ohio law would apply in the absence of an effective choice of law by the parties. See, e.g., Gries SportsEnterprises, Inc. v. Modell (1984), 15 Ohio St.3d 284. Additionally, DMHA is not a federal agency and merely receives federal funds for housing, meaning that federal common law is only persuasive, not controlling. Linan-Faye Constr. Co., Inc. v.Housing Auth. of the City of Camden (C.A. 3 1994), 49 F.3d 915,919.
We do note that the DMHA contract contains an "Order of Precedence" clause, which discusses priority where conflicts exist among the contract, state law, and federal law. Specifically, under Section 26 of the contract, if a conflict exists between the contract and state law, state law takes precedence, unless the state law conflicts with or is less restrictive than a federal law, regulation, or an Executive Order. To the extent this is a "choice of law" provision, we interpret it as applying only where a conflict first exists between the contract and Ohio law.
As a preliminary point, we find no conflict between the contract and Ohio law. First of all, Ohio does allow contractual limitations on remedies and damages. See, e.g., Domestic LinenSupply Laundry Co. v. Kenwood Dealer Grp., Inc. (1996),109 Ohio App.3d 312. Furthermore, although Ohio law on termination for convenience is sparse, the Ohio Supreme Court did permit the use of such a clause in Refreshment Serv. Co., Inc. v. City ofCleveland (1980), 63 Ohio St.2d 89. In that case, the City of Cleveland entered into a long-term contract for operation of food and beverage concessions in a public auditorium. The contract allowed the City to terminate the agreement "at any time on thirty (30) days written notice * * * if and when * * * the city determines such termination is in the public interest." Id. at 91. Before the end of the contract term, the City board of control voted to terminate the contract, and the concession company then sued. When the case reached the Ohio Supreme Court, the court found that the contract gave the City board of control discretion to terminate the agreement. Id. at 92. The court also applied a presumption of good faith to the action of the public officials. Specifically, the court said that "the presumption that the discretionary action by the board was in good faith has not been rebutted. Under such circumstances, a court will not substitute its judgment for that of the administrative officials."Id.
In light of the preceding authority, we find no barrier under Ohio law to use of a termination for convenience clause or to limitation of Peterson's damage recovery. Moreover, to the extent that Ohio law exists and is relevant, it does not appear to be less restrictive than federal law, which applies "good faith" and "abuse of discretion" to a contracting officer's decision to terminate contracts. See, e.g., Krygoski Constr. Co. v. UnitedStates (Fed. Cir. 1996), 94 F.3d 1537, 1541.
Having concluded that no barrier exists to applying Ohio law, the next issue concerns the damages which would be recoverable. Under Ohio common law, "t]he damages awarded for a breach of Ccontract should place the injured party in as good a position as it would have been in but for the breach. Such compensatory damages, often termed "expectation damages," are limited to actual loss, which loss must be established with reasonable certainty."Textron Fin. Corp. v. Nationwide Mut. Ins. Co. (1996), 115 Ohio App.3d 137,144. Actual damages include lost profits, which may be recovered if:
 (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.
Charles R. Combs Trucking, Inc. v. International Harvester Co.
(1984), 12 Ohio St.3d 241. Furthermore, lost profits can include items like damages based on loss of bonding capacity. Compare,Avon Excavating Co. v. City of Parma (Dec. 31, 1980), Cuyahoga App. No. 41557, unreported, pp. 13-15 (loss of bonding capacity is properly included in claim for lost profits), and Royal Elec.Const. Corp. v. Ohio State University (Dec. 21, 1993), Franklin App. Nos. 93AP-399, 93AP-424, unreported, reversed on other grounds (1995), 73 Ohio St.3d 110 (lost profits due to loss of bonding capacity may be recovered where a contractor can demonstrate specific lost job opportunities). Therefore, absent other factors, Peterson would have been entitled to recover its actual damages, including lost profits and loss of bonding capacity.
As we mentioned, the magistrate and trial court both felt that the contract limited damages. In this regard, the termination for convenience clause says that DMHA is liable for "reasonable and proper costs" resulting from the termination. The contract does not specifically define the term "reasonable and proper costs," nor does it contain an express limitations clause like those which typically limit contractual liability or restrict damages. Compare, Collins v. Click Camera Video, Inc. (1993),86 Ohio App.3d 826, 829 (indicating that video transfer center will only pay certain damages, and further stating that center "shall not be liable for any other loss or damage, direct, consequential, or incidental arising out of * * * use of the * * * facilities); Matrka v. Delta Airlines, Inc. (1997), 116 Ohio App.3d 678,681 ("Carrier shall not be liable for any consequential or special damages whether or not the Carrier had knowledge that such damages might be incurred"); and Chemtrol Adhesives, Inc. v. American Mfrs.Mut. Ins. Co. (1989), 42 Ohio St.3d 40, 43 (contractual limitation of damages was enforceable where contract provided that in the event of breach, purchaser "shall not be entitled to recover incidental or consequential damages including those arising upon breach of IMPLIED WARRANTY OF MERCHANTABILITY or any losses, costs, expenses, liabilities and damages (including, but without limitation to, loss of use or profits, damages to property, all liabilities of the Purchaser to its customers or third persons, and all other special or consequential damages) whether direct or indirect, and whether or not resulting from, or contributed to by the default or negligence of Seller, its agents, employees, or subcontractors, which might be claimed as the result of the use or failure of the equipment delivered").
On the other hand, the termination clause does say that DMHA "shall be liable * * * upon the receipt * * * of a properly presented claim setting out in detail" five listed items. These five items include: 1) the cost of work performed to the date of termination; 2) the cost of settling subcontractor claims; 3) the cost of preserving work; 4) the cost of presenting the termination claim; and 5) reasonable profit on the work performed. Since DMHA specifically mentioned only five categories, one could argue that the intent was to exclude any items which were not mentioned. See, e.g., Watkins v. Brown (1994), 97 Ohio App.3d 160, 166 (when interpreting contracts, principle of "expressio unius est exclusio alterius" is applied, meaning "the express mention of one thing implies the exclusion of another."
Although the matter is not completely free from doubt, we conclude that the contractual intent was to limit termination claims to the five categories of listed items. However, despite this limitation, Peterson contends that federal law should be applied to allow recovery for full contract damages, including the loss of bonding capacity.
Unfortunately, a review of federal law indicates that the federal courts have not always been consistent in how they evaluate the government's rights and obligations when contracts are terminated. See discussion in Krygoski, 94 F.3d at 1541-42
(outlining conflicts in the Court of Claims' own decisions). Originally, the federal government used termination for convenience as a means to avoid wartime contracts after hostilities had ended. Under this method, the government could terminate contracts and settle with contractors for partial performance. Id. at 1540. In the beginning, the government relied on statutes and regulations which allowed termination, but by 1967, the Federal Procurement Regulation required the insertion of termination for convenience clauses in most procurement contracts. Id. at 1540-41.By 1974, the Court of Claims' interpretation of the government's termination rights was so liberal that the Navy was allowed to terminate a contract to obtain a better price, even though it knew of the better price when the contract was awarded. Id. at 1541, referring to ColonialMetals Co. v. United States (Ct. Ct. 1974), 494 F.2d 1355. Subsequently, in 1976, the Court of Claims required contractors to show that the government's actions were in "bad faith or a clear abuse of discretion." Kalvar Corp. Inc. v. United States (Cl. Ct. 1976), 543 F.2d 1298, 1301. The court did not decide if "bad faith" was tantamount to "abuse of discretion." Id. at n. 1. However, the court did comment that some of its decisions had used the terms "bad faith, "abuse of discretion," and "gross error" interchangeably. Id. According to Kalvar:
 [a]ny analysis of a question of Governmental bad faith must begin with the presumption that public officials act "conscientiously in discharge of their duties." * * * This court has always been "loath to find to the contrary," and it requires well-nigh "irrefragable proof" to induce the court to abandon the presumption of good faith dealing. * * *
In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some "specific intent to injure the plaintiff." [Examples] are actions which are "motivated alone by malice, * * * [or] a proven "conspiracy * * * to get rid of plaintiff," * * * [or] a course of "Governmental conduct which was "designedly oppressive."
Id.
Subsequently, however, the United States Court of Claims adopted a less deferential attitude toward the government's actions. Specifically, in 1982, the Court of Claims overruledColonial Metals and restricted convenience terminations to situations where a change of circumstances justifying the action took place between the contract award and the time of termination.Torncello v. United States (Ct.Cl. 1982), 681 F.2d 756. In later decisions, courts vacillated between applying Torncello or theKalvar standard. See Krygoski, 94 F.3d at 1542. Ultimately, the Federal Circuit Court of Appeals (successor to the Court of Claims) rejected Torncello's reasoning, and stated in Krygoski that recent case law and enactments on competition in contracting had disclosed "a clear signal for implementation of termination for convenience clauses." Krygoski, at 1540.
When the court discussed termination for convenience inKrygoski , it noted that "in the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate is conclusive." Id. at 1543. However, the court then went on to say that the following factors had been used to test the arbitrariness of a termination decision:
 (1) the procurement official's bad faith, (2) the reasonableness of the decision, (3) amount of discretion delegated to the procurement official, and (4) violations of an applicable statute or regulation alone may be arbitrary.
Id., citing Keco Indus. Inc. v. United States (Ct.Cl. 1974),492 F.2d 1200. This was not the same standard that was used inKalvar, and did not equate bad faith with abuse of discretion. Further, after Krygoski, the Federal Circuit continued to look at government actions in terms of whether the government had acted unreasonably. See TM Distributors, Inc. v. United States (Fed. Cir. 1999), 185 F.3d 1279, 1284.
The differences in some of the cases might be explained by the fact that they deal with the government's initial choice to terminate a contract for convenience, as opposed to a termination for default that is later converted into one for convenience. In the latter event, the government cannot be said to have "exercised discretion" in terminating for convenience, because the government made no decision at all about such a basis for ending the contract — except perhaps after the fact, during a lawsuit. Instead, "constructive termination for convenience" began as a judicial doctrine that allowed an actual breach by the government to be retroactively justified. Linan-Faye, 49 F.3d at 923. For example, in Kalvar, the General Services Administration (GSA) entered into a "primary source of supply" contract for film with one company, but later bought film from another source. Kalvar,543 F.2d at 1300. The GSA's decision was based on a belief that the film in question was beyond the scope of the primary source contract. Id. However, GSA did not terminate for convenience. To the contrary, GSA discovered only after briefs were filed with the Court of Claims that the contract had a standard clause converting any breach to a termination for convenience. Id. By contrast, Krygoski involved a contract that was originally terminated for convenience. However, the cases do not make this distinction, and one can only conclude that federal case law is not a model of clarity. Nevertheless, after reading many cases, we believe that "bad faith" and "clear abuse of discretion" should limit an agency's ability to originally terminate a contract for convenience as well as its later reliance on contractual clauses allowing conversion of default terminations. As the court inKalvar noted:
 [i]n the absence of bad faith or clear abuse of discretion, the effect of the constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the clause.
543 F.2d at 1304. Therefore, because legitimate breach claims are mooted when the government or a public agency retroactively asserts termination for convenience, some restraint is appropriate. Certainly, government agencies insert these clauses in their contracts with full knowledge of the backdrop of federal law.
And, as we said, the clause itself is not completely free of ambiguity. In this regard, we note that even when default termination has been converted into termination for convenience, recovery has been granted for damages paid by sureties, despite the fact that such damages are not typically explicitly mentioned in termination for convenience clauses. See, e.g., Appeal ofWolfe Constr. Co. (Sept. 9, 1988) Eng. BCA No. 5309, 88-3 BCA P21,122, pp. 51-52, citing William Green Constr. Co. v. UnitedStates (Ct.Cl. 1973), 477 F.2d 930. In this regard, the reasoning is that allowing these damages "accords with common sense, fairness, and a reasonable interpretation and application of the scheme and clause governing termination for convenience of a construction contract following its conversion from a termination for default." Wolfe, at p. 52.
Like the federal courts, we do not think "bad faith" and "clear abuse of discretion" mean exactly the same thing. For example, in a similar context, Ohio courts have not used these terms interchangeably. Instead, "bad faith" and "abuse of discretion" have been treated as separate concepts. See, e.g.,Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.
(1995), 73 Ohio St.3d 590, 605 (indicating that to establish fraudor abuse of discretion, party contesting award of waste management bid must show that county waste management district acted in "bad faith or with an unreasonable, arbitrary or unconscionable attitude) (emphasis added); Cedar Bay Const., Inc. v. City ofFremont (1990), 50 Ohio St.3d 19, 22 (defining "abuse of discretion" in context of Ohio competitive bidding statute); andCleveland Const., Inc. v. Ohio Dept. of Adm. Serv., Gen. Serv.Adm. (1997), 121 Ohio App.3d 372, 388 (rejecting challenge of unsuccessful bidder for construction of facility at state university, because State Department of Administrative Services did not abuse its discretion in awarding bid). Typically, Ohio law defines "abuse of discretion" as:
 more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude * * *." "Arbitrary" means "without adequate determining principle; * * * not governed by any fixed rules or standard." * * * "Unreasonable" means "irrational."
Cedar Bay Const., Inc., 50 Ohio St.3d at 22. In contrast, bad faith, "although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." Slater v. Motorists Mut. Ins. Co. (1962),174 Ohio St. 148, syllabus.
As a final point in this regard, Peterson claims that the termination for convenience clause makes the contract illusory. A "contract is illusory only when by its terms the promisor retains unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and this makes it merely illusory." Century 21 American Landmark,Inc. v. McIntyre (1980), 68 Ohio App.2d 126, syllabus. However, the fact that discretion to terminate is limited by concepts like bad faith and abuse of discretion prevents the contract from being illusory. Linan-Faye, 49 F.3d at 924. Moreover, the reimbursement provided is sufficient consideration to the contractor to support the government's right to terminate a contract for convenience.Appeal of Montana Refining Co. (Dec. 10, 1999), ASBCA No. 50515, unreported, p. 12. Therefore, we disagree that the contract was illusory, simply because it contained a clause allowing the contract to be terminated for convenience.
Based on the preceding discussion, we find that the trial court should have considered whether DMHA used bad faith or abused its discretion regarding the termination of the Peterson contract. In this regard, we note that Peterson has conceded on appeal that bad faith "was probably not proven at trial." We agree with that statement. Our own analysis also indicates that a clear abuse of discretion was also not proven, even if we accept Peterson's factual arguments. Therefore, while the court should have considered DMHA's abuse of discretion or bad faith, any error was harmless. See, e.g., Fada v. Information Sys. Networks Corp.
(1994), 98 Ohio App.3d 785, 792 ("existence of error does not require a disturbance of the judgment unless the error is materially prejudicial to the complaining party").
In support of its allegation that DMHA abused its discretion, Peterson makes several points. The first is that the contracting officer, Roland Turpin, had sole authority to terminate the contract, but did so without investigating the validity of the termination. Based upon Turpin's testimony, we agree that he had very little knowledge regarding the performance of this contract. However, we do not agree that Turpin's relative ignorance amounted to a clear abuse of discretion.
Referring to the Krygoski factors, there was no evidence that Turpin acted in bad faith or had any intent to injure Peterson.94 F.3d at 1543. Further, Turpin had a great deal of discretion under the contract. Id. Specifically, the contract clearly gave Turpin, as contracting officer, the sole authority to terminate the contract. The contract also did not have a provision limiting Turpin's ability to rely on the information of others when making a termination decision. See Pacific Architects and Engineers,Inc. v. United States (Ct.Cl. 1974), 491 F.2d 734, 744-45
(holding that a contracting officer may obtain and agree with advice of others in making decision to terminate contract), andAppeal of Quality Environment Systems, Inc. (July 22, 1987), ASBCA No. 22178, unreported, p. 108 (finding that termination is not affected if the contracting officer relies on staff in reaching the decision).
Referring to the third factor from Krygoski, Turpin's decision to terminate was not unreasonable or irrational.Krygoski, at 1543. At trial, Turpin said his staff told him about substantial delays and materials problems that had arisen on the project. Turpin also had heard comments from several individuals about workmanship issues. While this was the extent of Turpin's knowledge at the time the termination letter appeared on his desk, the testimony also revealed that several people from DMHA had extensive contact with the project. These individuals met with Peterson to discuss concerns, and reported either directly or indirectly to Turpin.
As Executive Director of DMHA, Turpin reasonably relied on his staff in making the decision. Even if we felt that Turpin should have relied less on the advice of others in making his decision, an error of judgment or incompetence does not rise to the level of clear abuse of discretion. See District of Columbiav. Org. for Environmental Growth, Inc. (D.C. 1997), 700 A.2d 185,201.
Peterson further argues that Turpin's failure to make written findings of fact about requests and justifications for time extensions indicates an abuse of discretion. We must again disagree. In reviewing the issue of notice, the magistrate found that Peterson gave DMHA appropriate notices under the contract and that DMHA breached the contract by failing to adequately respond. However, assuming that this is true, it simply means that DMHA failed to comply with all of its duties under the contract. It does not mean that DMHA abused its discretion. As has been stressed many times, abuse of discretion is "more than an error in judgment." See, e.g., Cedar Bay Const., Inc.,50 Ohio St.3d at 22.
Another claim Peterson makes to support an abuse of discretion is that DMHA terminated simply to get Peterson off the project. This allegation is based on testimony from Talbert Grooms, the DMHA Director of Contracts. According to Grooms, the termination decision was timed so that DMHA would have time to hire another contractor to complete the project. Peterson claims this was improper, and relies on Quality Environment Systems,Inc., supra, which says that a default termination is an abuse of discretion when it is "taken solely to rid the Government of having to deal with the terminated contractor." Id. at p. 83.
We agree with this general principle. However, we disagree that the mere exercise of a termination option means the government must be trying to "get rid" of a contractor. Instead, the government may reasonably consider factors like the time needed to employ another contractor to finish a job. In the present case, there was ample testimony at trial from DMHA officials about substantial delays in the project, problems with workmanship and cleanliness of the project site, and issues with the way Peterson resolved materials problems. In addition, DMHA personnel testified that during all the time that design issues were being discussed, Peterson failed to complete work in areas where the design issues did not exist. This, in turn, caused DMHA officials to lose faith that Peterson would be able to complete the work even if the design issues were resolved. While we agree with the trial court that these reasons were insufficient to support a termination for default, they do show that the sole reason for termination was not to "get rid" of Peterson.
Additionally, the above evidence suggests that DMHA was growing unhappy with Peterson's performance, which justifies termination for convenience. Org. for Environmental Growth,supra, at 202. And finally, time was of some importance. As we mentioned earlier, the project originally came into being as a result of citations DMHA had received from the City of Huber Heights. Therefore, DMHA did not act unreasonably in "calling it quits" at a certain point in order to get another contractor on the job. Again, considering all the testimony about the reasons for terminating this contract, we cannot find that DMHA clearly abused its discretion.
As a final matter, we have found no statutory violations, nor has Peterson suggested that any such violations existed.Krygoski, 94 F.3d. at 1543. Accordingly, we agree with the trial court that DMHA wrongfully terminated for default. We agree with Peterson that the trial court should have considered whether DMHA acted in bad faith or abused its discretion. However, any error was harmless, since the record does not indicate, even under Peterson's version of affairs, that DMHA clearly abused its discretion in terminating the contract. Therefore, pursuant to Section 32(c) of the contract, Peterson's recovery was properly limited to those items allowed in the termination for convenience clause [Section 34(b)].
In light of the preceding discussion, Peterson's first assignment of error is overruled.
 II
In the second assignment of error, Peterson alleges that the trial court erred in limiting its claims for surety expenses and expert fees (those of Carl Meglan). In this regard, Peterson argues that even if its damages are limited by Section 34(b), it is still entitled to compensation for these two items. We will also consider if two additional items of damages (related to the fascia) may be recovered.
A. Claim for Surety Expenses
According to Peterson, federal law allows contractors to make claim for expenses a surety has paid, where the contract has been terminated for convenience. Conversely, DMHA relies on Ohio law, which allegedly prohibits sureties from recovering "voluntary" payments from their principal. DMHA's position in this regard is that Peterson's surety (National American Insurance Company) did not have a fixed legal obligation to pay until DMHA filed suit on the claim. Therefore, National "voluntarily" paid the DMHA claim and may not recover its expenses from Peterson. DMHA further contends that Peterson may assert any defenses it has to payment (presumably DMHA's breach of contract) in any action National brings for reimbursement. And finally, DMHA disputes the amount of bond damages Peterson is claiming. We note that DMHA has not responded to Peterson's argument about the applicability of federal law.
After the hearing, the magistrate made factual findings as to specific amounts of damages that Peterson had incurred. However, she did not list any amount for damages which might be due because of National's payment to DMHA. Peterson objected to the magistrate's failure to award damages for the bonding company's expenses, but the trial court held, as we have noted, that damages were limited to the amounts specifically awarded by the magistrate. The trial court did not mention the specific issue of surety damages in its decision.
As part of the bid process, DMHA required successful bidders to obtain performance bonds. As a result, Peterson purchased a performance bond from National, which bound Peterson as principal, and National, as surety, to DMHA in the amount of $57,148. According to the bond, the obligation would be void if Peterson fully performed the contract, but otherwise would be in full force and effect.
To obtain the performance bond, Jeff Peterson signed an indemnity agreement on behalf of Peterson. The agreement was also individually signed by Jeff and Teresa Peterson. All three parties agreed to indemnify and hold National harmless:
 from any and all liability for losses and expenses of whatsoever kind or nature, including the fees and disbursements of counsel, and against all said losses and expenses which Surety may sustain or incur (1) by reason of having executed or procured the execution of any Bond(s) to be issued by Surety.
The agreement further provided that:
 [t]he Undersigned will pay over, reimburse and make good to Surety all sums and amounts of money which Surety shall pay or cause to be paid or become liable to pay under the Bond(s), or as charges and expenses of whatever kind or nature, including counsel, special counsel, and consulting fees, by reason of the execution of said Bond(s) or in connection with any litigation, investigation or other matters connected therewith. The Undersigned will make such payments to Surety as soon as Surety shall have become liable therefore, and whether or not Surety shall have paid out any part of all of such sums.
As an additional matter, the agreement stated that:
 [a] Surety may pay or compromise any claim, demand, suit, judgment or expense arising out of any Bond(s), and such payment or compromise shall be binding upon the Undersigned, and included as a liability, loss or expense covered by this Agreement, provided that the same was paid by the Surety in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all the circumstances.
As we said earlier, Section 32 of the contract gave DMHA the ability to terminate a contractor's right to proceed with delayed work. In that event, DMHA could take over the work and complete it. Section 32 also stated that the contractor and its sureties would be liable for any damage, including increased costs, which resulted from the contractor's failure to complete the work within the specified time. However, if it was determined that the contractor was not in default or that the delay was excusable, the parties' rights and obligations would be the same as if the termination had been for DMHA's convenience.
After Peterson's alleged default, National paid the following amounts in connection with the bond: $15,000 to DMHA, $3, 406.51 in legal fees, and $12,086.03 for engineering and consulting services. National's consultant testified at trial that the above amounts did not include other expenses, yet to be calculated. These latter expenses included attorney and appearance fees and expenses for the DMHA/Peterson trial.
As an initial point, we reject the argument that National's payment was "voluntary" and, therefore, barred Peterson's claim against DMHA. In the first place, we have not found Ohio authority indicating that a prior lawsuit or judgment against a principal is a prerequisite for recovery of amounts paid by a surety. Instead, the law is that a surety bond is a contract and is "subject to the rules governing performance of contracts."State v. Scherer (1995), 108 Ohio App.3d 586, 591. " `Suretyship is the contractual relation whereby one person, the surety, agrees to answer for the debt, default or miscarriage of another, the principal, with the surety generally being primarily and jointly liable with the principal.' " Manor Care Nursing Rehab. Ctr. v.Thomas (1997), 123 Ohio App.3d 481, 487 (citations omitted). Seealso, St. Paul Fire Marine Ins. Co. v. Industrial Com'n of Ohio
(1987), 30 Ohio St.3d 17, 20 (a surety is " ` primarily and jointly liable with the principal debtor * * * [and] [h]is obligation is created concurrently with that of the principal debtor' "). Accordingly, a surety may compromise a claim and still recover from the principal. In fact, the indemnity agreement in the present case provides for just such a contingency. Specifically, the agreement allows National to compromise claims and to recover against Peterson if National paid "in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all the circumstances."
As a further matter, the cases cited by DMHA do not say that judgment must be obtained against a principal before the surety can be held liable. For example, in Russell v. Failor (1853),1 Ohio St. 327, four parties signed a promissory note, and one party made full payment on the amount due after default. In a subsequent suit for contribution, the court held that the note was void due to usury. As a result, the court barred any recovery for contribution because the party who paid knew of the usury before discharging the debt. Id. at 330-31. Notably, such a situation would also bar recovery by National under the Peterson indemnity agreement, since National would not have a "reasonable belief" that it was liable for the amount disbursed.
Similarly, in The Mutual Finance Co. v. Politzer (1970),21 Ohio St.2d 177, the Ohio Supreme Court simply held that guarantors may waive a mortgagor's defense to payment of indebtedness. InPolitzer, the mortgagee did not comply with statutory notice requirements for collection of deficiency judgments. However, the mortgagor and two guarantors waived the defect in writing and agreed to be responsible for any deficiency balance. Id. at 179-80. In a later suit to collect the deficiency, the Supreme Court held that the chattel mortgagee was precluded by statute from relying on the waiver agreement of the mortgagor. Id at 182. The court also found that this protection extended to the guarantors, even though they were not mentioned in the statute. In this context, the court reasoned that to hold otherwise would indirectly deprive the mortgagor of the benefit of the statute or would deprive the guarantor of its right of reimbursement. Id. at 183-84. On the other hand, the court found that the guarantors (unlike the mortgagor), could waive the defense because they were not explicitly mentioned in the statute. Id. at 185.
In the course of its discussion, the court did say that "whatever amounts to a good defense to the original liability of the principal, is a good defense for the sureties when sued." Id.
at 183-84. However, we do not read this as an absolute bar to a potential suit by National against Peterson, nor do we think it absolutely bars Peterson's claim to recover surety expenses. As we said, suit does not have to be brought before the surety can become liable. And, whether the surety had a reasonable belief that it was liable is a factual matter that a trial court would decide.
Having disposed of DMHA's claim that recovery is absolutely barred, we now turn to Peterson's argument for recovery of surety expenses. As we said, Peterson contends that a contractor may claim surety expenses on behalf of its surety when the contract has been terminated for convenience. We agree with Peterson on this point. As we mentioned earlier, federal cases have allowed contractors to present claims for surety expenses, where contracts are terminated for convenience. See William Green Constr. Co. v.United States (Ct.Cl. 1973), 477 F.2d 930; Carchia v. UnitedStates (Ct.Cl. 1973), 485 F.2d 622, 629; and Appeal of WolfeConstr. Co. (Sept. 9, 1988) Eng. BCA No. 5309, 88-3 BCA P21,122. In Wolfe, the Corps of Engineers Board of Contract Appeals found that allowing surety expenses "accords with common sense, fairness, and a reasonable interpretation and application of the scheme and clause governing termination for convenience of a construction contract following its conversion from a termination for default." Id. at p. 52. Furthermore, in Wolfe, the Board noted that the principal need not actually have paid the surety in order to have incurred a "cost" under a binding indemnity agreement. Id. at 79. To the contrary, the Board noted that the contractor was obligated by the agreement and could include the surety's costs in its termination claim. Id.
In this case, DMHA would have contracted with knowledge of how termination for convenience clauses have been interpreted. Accordingly, Peterson is entitled to make a claim to recover costs paid by its surety. Because the magistrate and trial court erred in failing to allow Peterson to pursue this claim, the second assignment of error is sustained in part. However, since neither the magistrate nor the trial court made factual determinations about the amounts which might be due or the reasonableness of the payments, this issue must be remanded for further consideration.
In this regard, we think National should be added as a party so that the issue can be completely resolved. We agree with Peterson that since DMHA wrongfully terminated the contract, it would be inappropriate for DMHA to keep $15,000 when Peterson has a potential liability to its surety in excess of $30,000. In other words, DMHA's breach does not entitle it to have third-parties pay for its projects. By the same token, Peterson should not recover against DMHA if National does not actually intend to require reimbursement from Peterson. Adding National as a party will allow all claims to be resolved in one setting.
B. Expert Fees of Carl Meglan
As we mentioned, Peterson also claims in its second assignment of error that the magistrate should have recommended an award of more than $1,225 for the services of Peterson's expert, Carl Meglan. Meglan provided consulting and expert witness testimony at trial about expenses incurred by Peterson due to the termination for default. At the time of trial, Meglan could only account for $1,225 for his fees and gave a speculative estimate of $1,000 for amounts yet to be billed for time leading up to and including trial. The magistrate found that "no evidence was put forth to substantiate this claim and the record does not reflect an accounting of such expenses." Therefore, she refused to speculate about the actual fees, and awarded the amount which was substantiated.
After the magistrate's decision, Peterson submitted a revised invoice from Meglan for $3,079.06 to the trial court. However, the trial court refused to consider the evidence, since Peterson could reasonably have presented the evidence at trial. We agree with the trial court.
Specifically, Civ.R. 53(E)(4)(b) says that a trial court may "refuse to consider additional evidence proffered upon objections unless the objecting party demonstrates that with reasonable diligence the party could not have produced that evidence for the magistrate's consideration." In this regard, we note while Meglan may not have been able to quote the precise amount of his final bill, he could have testified about travel costs, time expended up to trial, estimated time for testimony, and his hourly rate. This would then have given the magistrate concrete evidence to substantiate a higher amount of fees. Since this testimony was not provided, the trial court properly refused to accept the affidavit and invoice after the fact. Consequently, this part of Peterson's second assignment of error is without merit.
C. Damages related to Fascia Costs
Finally, we will consider the fascia costs which Peterson claims were incurred due to DMHA's breach. Although these were not specifically raised as part of the second assignment of error, Peterson did argue in the first assignment of error that these items should have been awarded as "direct costs." Peterson further contended that these items should have been awarded as part of an equitable adjustment to the contract, which was a subject raised in the second count of Peterson's complaint. Peterson's claim in this regard is that fascia costs increased because DMHA provided defective specifications.
The two costs involved are the price of the original fascia board ordered by Peterson for $2,060.16, and the cost incurred to field-prime the board ultimately used on the project ($3,356.16). According to contract specifications, the fascia " product" was to be "1" by 6" pre-primed fascia board." Consistent with this specification, Peterson ordered 1" by 6" pre-primed composition fascia board. When the board arrived, DMHA told Peterson that natural wood was intended, rather than composition board. Ultimately, DMHA rejected the material, and it could not be returned. At trial, Don Pugh of DMHA admitted that the phrase "pre-primed fascia board" could be interpreted to mean either composition board or natural wood. Therefore, the fascia ordered by Peterson met the specifications as drafted by DMHA.
Under Section 34(b)(2), DMHA is liable for reasonable and proper costs for "materials and supplies delivered to the site, payment for which has not been made by the PHA to the Contractor or by the Contractor to the subcontractor or supplier." Since Peterson ordered the fascia material in compliance with the specifications, Peterson should not have to incur this loss.
On the other hand, we do not think the cost of field-priming the fascia is covered by Section 34(b). According to the testimony, Peterson ordered new fascia board after the original material was rejected. The board was ordered from a supplier specified by DMHA, and the order again was for pre-primed board. However, because of delay in receiving the order, Peterson told the supplier to send the board unprimed. Peterson then primed the board on the job site at an additional cost of $3,356.16.
Peterson made this decision on its own, without order or permission from DMHA. Moreover, there was no testimony as to any difference in price (or savings) for unprimed material. Since Peterson decided on its own to field-prime the fascia, the cost does not squarely fall into any reimbursement provision in Section 34(b). Accordingly, the cost for field-priming the fascia is not reimbursable under Section 34(b).
In light of the preceding discussion, Peterson's second assignment of error is sustained in part and is overruled in part. On remand, National should be added as a party and the court should decide the amounts Peterson is entitled to recover for payments made by National. Peterson should also be awarded an additional $2,060.16 for the cost of the rejected fascia board. On the other hand, the request for Carl Meglan's added expenses and the cost of field-priming the fascia are rejected.
 III
In the third assignment of error, Peterson contends that the trial court erred in not awarding Peterson attorney's fees in the amount of $42,691, plus $1,610.61 in disbursements. As an initial point, Peterson says the magistrate erred by not adhering to trial court's order recommitting the issue of attorney fees. We find this argument without merit. In the November 7, 1997 decision, the magistrate found:
 [p]ursuant to Section 34(b)(4), as contract damages, Plaintiff is entitled to the reasonable attorneys fees expended to litigate this matter. However, no evidence was presented as to the amount expended or the reasonableness or necessity of such fees as required by DR 2-106(B).
Based on this finding, attorney's fees were denied. In reviewing the magistrate's decision, the trial court remanded so that the magistrate could "determine adequate fees." Subsequently, on October 19, 1998, the magistrate held a hearing and awarded fees of $3,070.50. However, neither the magistrate nor the trial court had been given any evidence about attorney fees before the October 19, 1998 hearing. As a result, the extent of fees allowed under the contract had clearly not yet been analyzed. Therefore, any language about attorney fees in the November 7, 1997 magistrate's decision or the June 11, 1998 trial court decision is not even a factor in the ultimate decision on this issue.
When considering an award of attorney fees, Ohio follows the "American Rule," under which a prevailing party may not generally recover attorney fees. Sorin v. Bd. of Edn. (1976), 46 Ohio St.2d 177,179. Exceptions exist, and attorney fees may be allowed if: (1) a statute creates a duty; (2) an enforceable contract provision provides for an award of attorney fees; or (3) the losing party has acted in bad faith. Nottingdale Homeowners'Assn., Inc. v. Darby (1987), 33 Ohio St.3d 32, 33-34, and Sturm v.Sturm (1992), 63 Ohio St.3d 671, 675. Neither party in the present case has alleged that a statute exists allowing for attorney fees, and Peterson has conceded that bad faith was not shown. Notably, attorney fees are allowed where the defendant's actions were "in bad faith, vexatious, wanton, obdurate or oppressive." 63 Ohio St.3d at 675. As we previously mentioned, even clear abuse of discretion does not rise to that level.
Therefore, in order for Peterson to recover attorney fees, the contract must have provided for such an award. If a contract between the parties provides for attorney fees, the court will award a reasonable sum based on the language of the contract.33 Ohio St.3d at 34. In this regard, Section 34(b) of the contract says that DMHA:
 shall be liable to the Contractor for reasonable and proper costs resulting from such termination upon the receipt * * * of a properly presented claim setting out in detail: * * * (4) the actual or estimated cost of legal and accounting services reasonably necessary to prepare and present the termination claim [to DMHA].
(Emphasis and parenthetical material added).
As we previously noted, Ohio law on termination for convenience clauses is sparse, and resort to federal law can help. However, in the federal cases, contract language on attorney fees differs from the language stated above. In federal government contracts, the language generally allows for legal fees incurred in preparation of settlement claims. See Kalvar, supra,543 F.2d 1298, 1305, and Acme Process Equipment Co. v. United States (Ct. Cl. 1965), 347 F.2d 538, 544. In the present case, the clause provides for attorney fees incurred in preparation and presentation of a termination claim. No reference is made to settlement. For this reason, instead of relying on the federal cases in interpreting the attorney fee clauses of the contract, we will independently interpret the language of the contract involved in this case.
When the terms of a contract are clear and unambiguous, their interpretation is a matter of law to be decided by the court.State ex rel. Parsons v. Fleming (1994), 68 Ohio St.3d 509, 511. If the language is ambiguous and intent cannot be decided from within the four corners of the document, the trier of fact may need to make a factual determination. Id. In the present contract, the language "reasonably necessary to prepare and present the termination claim to" DMHA is not entirely free of ambiguity. Peterson argues that because DMHA refused to convert the termination for default into a termination for convenience, litigation was necessary to prepare and present a termination claim to the housing authority. For this reason, Peterson feels it is entitled to all attorney fees incurred in order to receive a judgment from the trial court that the termination should be converted. On the other hand, DMHA maintains that the clause does not include litigation expenses, but instead covers only fees incurred by Peterson in preparing and presenting its original proposal to DMHA, which occurred before litigation was filed.
While Peterson's argument is compelling, it cannot succeed. As we explained earlier, the American Rule is the prevailing rule in this state. For fees to be allowed, the contract language must clearly provide for the exception. Unfortunately, the pertinent contract clause makes no reference whatsoever to litigation expenses. Thus, accepting Peterson's position would place DMHA at a much greater risk in terminating for default than the contract language anticipates.
We appreciate Peterson's argument about the alleged absurdity of the result of the magistrate's decision. Specifically, Peterson argues that if the magistrate's decision stands, a contractor can recover attorney fees if a government entity acts appropriately by terminating for convenience, but cannot recover if the entity acts wrongfully in terminating for default. However, we do not agree with this reading of the decision. To the contrary, the magistrate simply found that the contract did not allow for litigation expenses. Therefore, no matter how the contract is terminated, no award of fees can be made beyond what is required for preparing and presenting a claim to the housing authority.
The reason for the contract exception to the American Rule is the fundamental right of parties to contract freely. Nottingdale,33 Ohio St.3d at 37. In this case, Peterson was free to contract with DMHA for an award of attorney fees that might be incurred in litigation if DMHA wrongfully terminated for default. However, this did not occur.
After hearing evidence on fees, the magistrate found that Peterson did not clearly show the exact sum spent to prepare and present the termination proposal. The magistrate did infer that all expenses incurred before August 31, 1996, were related to the task. Consequently, based on the testimony, she awarded $3,070.50 in attorney fees. We find that this award comports with the contractual language. Accordingly, Peterson's third assignment of error is without merit and is overruled.
 IV
In its fourth assignment of error, Peterson alleges that the trial court erred by failing to award prejudgment interest. We agree with Peterson on this point.
The issue of prejudgment interest is controlled by the Ohio Supreme Court case of Royal Electric Constr. Corp. v. Ohio StateUniv. (1995), 73 Ohio St.3d 110. In Royal Electric, the court criticized the test which had traditionally been used to decide prejudgment interest in contract cases, i.e., whether the claim was liquidated or unliquidated. Id. at 116. In this context, the court said:
 the focus in these types of cases should not be based on whether the claim can be classified as "liquidated," "unliquidated" or "capable of ascertainment." Rather, in determining whether to award prejudgment interest pursuant to R.C. * * * 1343.03(A), a court need only ask one question: Has the aggrieved party been fully compensated?
Id.
In the present case, the trial court appeared to comply withRoyal Electric. Specifically, the court denied prejudgment interest because it found that Peterson would "be made whole" by the damages award. However, this conclusion ignores the meaning of the Supreme Court's comments in Royal Electric. For example, after rejecting the traditional liquidated/unliquidated dichotomy, the Ohio Supreme Court went on to stress that:
 An award of prejudgment interest encourages prompt settlement and discourages defendants from opposing and prolonging, between injury and judgment, legitimate claims. Further, prejudgment interest does not punish the party responsible for the underlying damages * * * but rather acts as compensation and ultimately serves to make the aggrieved party whole. * * * Indeed, to make the aggrieved party whole, the party should be compensated for the lapse of time between accrual of the claim and judgment.
Id. (Emphasis added).
Consequently, the inquiry set out in Royal Electric was akin to a rhetorical question, which is answered affirmatively only if a party has been awarded pre-judgment interest according to statute. Dwyer Electric, Inc. v. Confederated Builders, Inc.
(Oct. 29, 1998), Crawford App. No. 3-98-18, unreported, p. 3. In other words, the question, "has the aggrieved party been made whole?" can only be answered affirmatively if there has been compliance with R.C. 1343.03(A). Id.
DMHA cites Royal Electric, but argues that trial courts still retain discretion to make factual determinations about when money becomes "due and payable." However, the trial court in the present case never made an observation about this point. From what we can glean from DMHA's brief, DMHA appears to interpret the award of interest following judgment as a decision by the trial court that the claim became "due and payable" at that time, i.e., after judgment.
As an initial matter, we must disagree with DMHA's factual position, if we have read it correctly. If a contractual claim becomes "due and payable" for prejudgment interest purposes at the time of final judgment, then prejudgment interest has been reduced to a meaningless concept. Taking such a position would also completely ignore the Ohio Supreme Court's comments in RoyalElectric. As the court noted, "[t]he award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment." 73 Ohio St.3d at 117.
On the other hand, we agree that trial courts should decide factually when a claim is "due and payable." See Dwyer, at p. 4. Peterson also agrees with this concept, and has included a chart in its reply brief indicating when various amounts were due. For example, Peterson claims that damages for items like the last pay application were due from the time the contract was terminated. On the other hand, Peterson believes bonding expenses should accrue interest from the date when the expenses were incurred.
We do note that while trial courts retain some discretion, it is not unlimited. For example, one could question when Peterson's contractual claims would logically have accrued, other than the day the contract was terminated. In the past, we have used our constitutional power to modify a trial court judgment and reflect an appropriate amount of interest. See City of Urbana v. McIntosh
(Oct. 24, 1997), Champaign No. 96 CA 20, unreported, p. 1 (modifying judgment so prejudgment interest would run from the date an ambulance service provided service). We could do the same here, at least with regard to the contractual damages which have been affirmed.
However, because of the need for remand on surety damages, we think the interest issue can be better addressed by the trial court. Accordingly, Peterson's fourth assignment of error is sustained, and the matter will be remanded to the trial court for consideration of when Peterson's various claims accrued for purposes of the prejudgment interest that Peterson is admittedly entitled to recover.
Based on the foregoing discussion, this appeal is disposed of as follows:
1) The first assignment of error is overruled.
 2) The second assignment of error is sustained in part and is overruled in part. This case is remanded for a decision on the amount of surety expenses Peterson may recover from DMHA. Additionally, the judgment of the trial court is amended to allow Peterson further recover of $2,060.16 for the rejected fascia board.
3) The third assignment of error is overruled.
 4) The fourth assignment of error is sustained. This case is remanded for a determination of the date prejudgment interest was due and payable. Judgment affirmed in part, reversed in part and remanded in part.
 __________________________ BROGAN, J.
FAIN, J., and YOUNG, J., concur.
[1] The magistrate used two different figures for retainage in her decision ($4,186 and $4,187). The trial court also used two different figures ($4,187 and $4,167). However, the total judgment recommended by the magistrate and the one adopted by the trial court were the same ($26,292.66). Unfortunately, the total of these amounts is actually $26,338.66, $26,337.66, or $26,318.66. If a clerical error needs to be corrected, that should be done on remand.
[2] For some reason, the objections were not docketed, nor are they in the lower court file. However, DMHA replied to the objections and the trial court specifically referenced them in its decision. Therefore, there is no dispute that objections were properly made to the magistrate's report.